John GROSS, Ben Gross and Dean Nelson, (# 14036) Plaintiffs and Appellants,

v.

CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, (# 14315) Defendant and Appellee,

and

Missouri Slope Feedlot, Inc., Mid-Dakota Feedlot Development Corporation and James Sutton, (# 14331) Defendants and Appellees.

Nos. 14036, 14315 and 14331.

Supreme Court of South Dakota.

Argued April 17, 1984.

Decided Jan. 9, 1985.

Rehearing Denied Feb. 15, 1985 in No. 14315.

Charles Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiffs and appellants.

Robert B. Anderson of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellee.

Darla Pollman Rogers of Meyer & Rogers, Onida, for defendants and appellees; Brian B. Meyer of Meyer & Rogers, Onida, on brief.

HENDERSON, Justice.

## ACTION

This is a consolidated appeal, ordered by this Court, arising from a summary judgment order denying a permanent injunction entered November 2, 1982, and a judgment entered for damages to realty, filed July 22, 1983. We affirm the summary judgment denying the permanent injunction and affirm the damage award.

## PROCEDURAL BACKGROUND

Separate actions were filed on June 20, 1980, by plaintiffs John and Ben Gross and plaintiff Dean Nelson against all defendants. Count I of the complaints requested damages for alleged flooding of plaintiffs' property by defendants. Count II requested a permanent injunction against any further flooding. Answers were filed, as well as cross-claims, between defendant Connecticut Mutual and the other defendants collectively. These cases were consolidated by order of the trial court on August 4, 1982.

Connecticut Mutual moved for summary judgment on both counts. Though summary judgment was denied as to Count I, Circuit Judge Patrick McKeever granted Connecticut Mutual's motion as to the request for injunctive relief on November 2, 1982. Thus, Count II of plaintiffs' complaint was dismissed on the merits and with prejudice. Notice of appeal on this order was filed December 22, 1982. Judge McKeever thereafter recused himself from any further proceedings.

Trial on Count I of plaintiffs' action was held before Circuit Judge Robert Miller on January 12–13, 1983. Judgment was entered July 22, 1983, finding each of the named defendants jointly and severally liable and awarding plaintiff Dean Nelson $8,000 damages and plaintiffs John and Ben Gross $16,000 damages, all for temporary and permanent injury to their land. Additionally, the Grosses were awarded $25,000 damages for the pollution and contamination of their domestic water well.

## FACTS

Mid-Dakota Feedlot Development Corporation (Mid-Dakota) owned land near Onida, South Dakota, and constructed a cattle feedlot thereon. Upon completion of the feedlot, Missouri Slope contracted with Mid-Dakota to lease and operate the premises. Connecticut Mutual Insurance Company (Connecticut Mutual) held the first mortgage on the property.

Mid-Dakota defaulted on its loan and Connecticut Mutual commenced foreclosure proceedings. A judgment of foreclosure was obtained in the spring of 1979. A judicial sale was conducted on April 12, 1979, at which Connecticut Mutual bid in its mortgage. Connecticut Mutual received a Sheriff's Certificate. Mid-Dakota never waived or relinquished its right of redemption during the one-year redemption period commencing April 12, 1979, and ending April 11, 1980.

The directors of Missouri Slope held their last corporate meeting in July 1978, and were thereafter considered by all parties to be a "defunct" corporation.

During the one-year redemption period, a lease agreement was entered into between Mid-Dakota and James Sutton, a former director of Missouri Slope. Sutton did not pay rent on the property, but agreed to maintain the feedlot in exchange for the use of the premises.

Missouri Slope held a discharge permit from the Environmental Protection Agency (EPA) during the time the feedlot was in operation. In 1979, the EPA issued an order of violation against Missouri Slope. Dam safety personnel from the South Dakota Department of Water and Natural Resources investigated. Department personnel, concerned that the dam could not continue to hold the quantities of water and effluent contained in the irrigation pond, warned that the dam could possibly break if remedial measures were not undertaken before additional quantities of water and effluent entered the pond.

A system of lagoons and settling ponds had been designed to accommodate the wa-

ter and liquids from the feedlots and were designed to be periodically pumped dry. The solid materials and wastes from the feedlot runoff were supposed to travel to the settling ponds where they would be collected and appropriately disposed of at a later date. One of the settling ponds had been drained into the irrigation pond dam prior to October 1979.

While the level of the irrigation pond had customarily been lowered by the use of irrigation pumping equipment, defendants did not resort to this method of alleviating the water in the pond. Instead, the former directors of Missouri Slope met in October 1979 and devised a plan to breach the dam. The Department of Natural Resources determined that the pond water was of sufficient quality and sanctioned the plan. Money for implementing the plan, including Sutton's, was contributed by these former directors.

Plaintiff Dean Nelson owned crop and pasture land just below the Mid-Dakota feedlot property. Plaintiffs Ben Gross and John Gross also owned farmland below and adjacent to that of Dean Nelson.

On October 22, 1979 (during the one-year redemption period), the irrigation pond dam was cut, releasing waters onto the lands below. Plaintiff Dean Nelson constructed a make-shift dam to prevent the released water from entering his property. The dam proved adequate. However, a second cut was made in the feedlot dam on October 29, 1979. The flow of water from this cut, accumulated with that already held by Nelson's improvised dam, passed around that dam and flooded a quarter-section of land. Nelson's quarter of land was inundated with water which consisted of 70 acres of farm ground, 50 acres of grass, and 40 acres embodying buildings, airstrip, and a machine storage area. The waters continued to flow down upon the land of John and Ben Gross, flooding a portion of two quarters. The flood waters froze and remained throughout the winter, not dissipating until May 1980.

The trial court found that the water was foul and polluted from feedlot waste. This feedlot effluent had a foul odor, a reddish-green color, and contained a great deal of debris and sediment. Nelson could not winter his cattle on a one-half section of land which was located to the east and removed from the path of drainage. Nelson expended $2,370 in landscaping costs on the affected quarter-section in 1980 after his land dried off. It appears that Nelson lost his efforts of summer fallowing and lost, for years, as effective a hay crop and crop because of the noxious weed seeds implanted in the soil arising from the flooding. Nelson testified as to a general decreased market value, not only as to his entire farm, but also, alternatively, a decreased market value in the quarter-section which had been flooded. With respect to the Grosses, flood waters and foul effluent also covered their lands, froze during the winter, and remained there from October 1979 until May 1980. Not only did the Grosses complain of foul sedimentation by the effluent, but diverse objects also flooded upon their land consisting of many vaccine bottles, old jugs, posts, manure, and other debris, much of which remained on their lands after the flooding waters had dissipated. The Grosses had a domestic water well on this flooded property and they testified that this foul and obnoxious effluent and sedimentation, with a strong offensive odor and brackish yellow water, filtered into their drinking water. Circuit Judge Robert Miller, the fact finder and in a sense the jury, personally viewed all of this property and the damage, to include this well, and found, from his personal eyesight and knowledge, that there was a temporary and permanent injury to the land belonging to Nelson and the Grosses. Circuit Judge Miller, we now note, is not confined to the testimony of Nelson or the Grosses concerning damages because he personally witnessed the damage. Without doubt, the circuit judge was impressed with not only his personal observation of the well, but the fact that Ben Gross testified that he has refused to drink water from this contaminated well and has purchased or otherwise obtained water for his consumption elsewhere since the aftermath of

the flooding. John Gross corroborated the testimony of Ben Gross expressing that the quality of the domestic well was putrid following the flooding and that he would not and could not consume the water from the well. The Grosses, and it is undisputed in the evidence, installed a purifier to the well water system so the water could be used for cooking purposes but they have refused to personally consume the water therefrom as drinking water. There was considerable testimony from both Ben Gross and John Gross of their damage, not only including the above, but that the value of the property was diminished in the amount of $100 per acre from the flooding (per testimony of Ben Gross). John Gross testified that the Grosses had suffered $50,000 damages attributable to the well contamination alone and that their lands had been damaged $80 to $100 per acre. During the view of the trial court, the trial court personally observed the feedlot pens, lagoons, settling ponds, irrigation pond and dam, adjacent lands, as well as plaintiffs' affected lands. In so doing, such observation greatly enhanced the circuit judge's appreciation of the geographical outlay of the affected lands and he became, in reality, a witness to facts which he ultimately made findings of fact upon. In trying this case, the circuit judge had to determine whether or not there was an "unreasonable injury" to plaintiffs' lands and determine if the "unreasonable injury" was the proximate cause of injury thereto. *See LaFleur v. Kolda,* 71 S.D. 162, 22 N.W.2d 741 (1946). He was further required, by law, to assess the damages which he personally witnessed and was required to take into consideration all of the testimony in the case in arriving at a damage with reasonable certainty, such as will be further disclosed below.

Defendants deny all liability, each claiming they had no control over nor responsibility for maintenance of the feedlot property. They further maintain that they were well within legal rights in allowing the flow of "surface" waters upon lower landowners. We treat four separate issues.

## DECISION

### I.

## WAS A SUMMARY JUDGMENT DENYING THE PERMANENT INJUNCTION PROPER UNDER THE CIRCUMSTANCES?

■ "In reviewing the trial court's order granting summary judgment, we premise our decision on the principle that affirmance of such a judgment is proper if there exists any basis which would support the trial court's ruling." *Uken v. Sloat,* 296 N.W.2d 540, 542 (S.D.1980); *Maryland Cas. Co. v. Delzer,* 283 N.W.2d 244 (S.D. 1979). Several criteria for ruling on a summary judgment motion are: The evidence must be viewed most favorable to the non-moving party; the burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; and, though the purpose of the rule is to secure a just, speedy, and inexpensive determination of the action, it was never intended to be used as a substitute for a court trial or for a trial by jury where any genuine issue of material fact exists. *Equilease Corp. v. Brech,* 318 N.W.2d 345 (S.D.1982).

Count II of plaintiffs' complaint requested an injunction against defendants permanently enjoining them from releasing, discharging, or otherwise allowing polluted water or sewage from coming onto their property. They further requested defendants be enjoined from creating an unhealthy nuisance in the vicinity of plaintiffs' property.

■ Appellants are quite accurate in their assertion that injunctive relief may be an appropriate remedy for injury suffered by unlawful flooding. *See Tisher v. Jarrett,* 75 S.D. 503, 68 N.W.2d 592 (1955); *Faris v. Moore,* 71 S.D. 482, 26 N.W.2d 130 (1947). However, the granting of injunctive relief rests in the discretion of the trial court. *Hofer v. Bridgewater Ind. Sch. Dist.,* 76 S.D. 483, 81 N.W.2d 300 (1957).

Further, an inadequate remedy at law is a prerequisite to such relief. *Hein v. Marts,* 295 N.W.2d 167 (S.D.1980); *Anderson v. Kennedy,* 264 N.W.2d 714 (S.D.1978). "An injunction should only be granted where, under the facts proven, it appears reasonably certain that the granting thereof will protect the party seeking it from some injury that would result in his damage." *Alsager v. Peterson,* 31 S.D. 452, 456, 141 N.W. 391, 392 (1913). Further, the right to an injunction must be established with reasonable certainty. *Hofer,* 81 N.W.2d 300.

▮ In the exercise of its discretion, a trial court is not only authorized, but is duty bound "to determine, not merely whether a party was entitled to an injunction at the time he instituted his action, but whether, *under the facts as they appear at the time of the trial,* such relief should be granted." *Alsager,* 31 S.D. at 456, 141 N.W. at 392 (emphasis supplied mine). Here, summary judgment was granted in favor of defendant, Connecticut Mutual, for the reason, stated in its order, "that at the present time, there is no evidence of an unhealthy nuisance near plaintiffs' property, nor any impending danger of the polluted water being dumped onto the plaintiffs' property ...."

▮ Based upon the affidavit and depositions urged in support of the summary judgment motion, and viewing these in a light most favorable to appellants, we agree with the trial court's refusal to grant injunctive relief. Dean Nelson, deposed in October 1980, indicated he had not noticed any feedlot runoff since the repair of the dam.

Appellant John Gross was quite upset over the presence of the feedlot in general. However, he was able to pasture his calves in the flooded area in May 1980. His deposition revealed there had been no other flows from the feedlot since the cut.

[I]f, pending a trial ... the court ... should find that in the future, owing to the conditions as they would apparently be, there would not be any further injury, such court would be fully justified in refusing an injunction, although it might be its duty to retain the case for the purpose of adjudging the amount of damages that had been suffered ....

*Alsager,* 31 S.D. at 457, 141 N.W. at 392. Appellants' desire to prevent a recurrence of the flooding incident is understandable. However, there is nothing to indicate such flooding might be a continuing threat. Further, in dismissing the injunction request, the trial court specifically ordered (by way of a jurisprudential safety-valve) "that if such circumstances should arise in the future, this order shall not be used as a bar for the reinstitution of the claim by plaintiffs in that regard." The trial court did not dismiss appellants' complaint for damages and the case was retained for a full and fair adjudication on that issue. Indeed, damages were awarded and are a subject of this appeal.

"It seems to be generally held that the applicant for an injunction has the burden of showing that he would in some manner be injured or deprived of some lawful right without the aid of such injunction, and that by the granting of such injunction he would obtain the desired relief." *State v. Olsen,* 30 S.D. 57, 71, 137 N.W. 561, 561–62 (1912). No such showing has been made. There is every reasonable suggestion or indication that the flooding incident was a one-time occurrence for which damages should prove adequate. Breaching this dam and a subsequent flooding is highly unlikely due to the tremendous impact of the breaching already done.

Therefore, we determine there was no abuse of discretion in refusing to grant the permanent injunction. Accordingly, the summary judgment order is affirmed.

## II.

DID THE TRIAL COURT ERR IN DETERMINING THAT DEFENDANTS WERE NOT WITHIN THEIR LEGAL RIGHTS IN DISCHARGING THE IRRIGATION POND WATER UPON PLAINTIFFS' LAND?

▮ Fundamental principles with regard to this Court's scope of review include

basic tests. Are the trial court's findings "clearly erroneous"? *Vaughn v. Eggleston,* 334 N.W.2d 870 (S.D.1983). We do not look to substitute our judgment for that of the trial court, but to determine whether, after reviewing all of the evidence, the appellate court is left with a definite and firm conviction that a mistake has been committed. *Matter of Estate of Gosmire,* 331 N.W.2d 562 (S.D.1983); *Matter of Estate of Nelson,* 330 N.W.2d 151 (S.D.1983). Further, we are not at liberty to change findings where the trial court has resolved conflicts in the evidence. *Mulder v. Tague,* 85 S.D. 544, 186 N.W.2d 884 (1971).

Defendants urge they were well within their rights in breaching the dam and allowing the waters to flow upon Nelson's and Grosses' property. They insist the waters in the irrigation pond constitute "surface waters" and that plaintiffs' property was burdened with an easement allowing upper property owners the right to drain surface waters through natural courses over lower property.

With regard to water drainage rights, South Dakota follows the "civil law rule," as essentially set out in *Thompson v. Andrews,* 39 S.D. 477, 491–92, 165 N.W. 9, 14 (1917):

> We hold the rule to be that the owner of dominant agricultural lands, situate and lying in the upper portion of a natural drainage water course or water basin has, in the course of and for the purposes of better husbandry, a legal easement right, by means of artificial drains or ditches constructed wholly upon his own land, to accelerate and hasten the flow of waters that are surface waters under the rule herein laid down, and to cast the same into and upon a servient estate lying lower down in the same natural drainage water course, at that point where nature, by means of ravines or depressions, has indicated that such surface waters should find a natural outlet
> . . . .

In upholding the civil law rule in *Johnson v. Metropolitan Life Ins. Co.,* 71 S.D. 155,

22 N.W.2d 737 (1946), this Court took special note of the language in *Thompson* indicating that the rule allows discharge of surface waters "over" and not "on" the land of another.

None of the parties dispute the rule as set forth in these cases. It is argued by plaintiffs, however, that the easement rights of the dominant landowner are not applicable to these facts in that 1) the waters were not surface waters and 2) were not discharged onto a natural watercourse. The trial court agreed. Again, this Court notes that the trial court personally observed the drainage area and determined that it was not a clearly defined channel or valley but, rather, was a flat, sprawling drainage area stretching southward from the feedlot premises and gradually weaving through the lands adjacent to the feedlot and through the plaintiffs' lands.

■ "Surface waters comprehend waters from rains, springs, or melting snows which lie or flow on the surface of the earth but which do not form part of a watercourse or lake." *Sullivan v. Hoffman,* 207 Neb. 166, 170, 296 N.W.2d 707, 710 (1980); *Lahman v. Comm'r of Highways,* 282 N.W.2d 573 (Minn.1979); Restatement (Second) of Torts § 846 (1979). The term does not comprehend waters impounded in artificial ponds, tanks, or water mains. *Thomson v. Pub. Serv. Comm'n,* 241 Wis. 243, 5 N.W.2d 769 (1942). "The chief characteristic of surface water is its inability to maintain its identity and existence as a water body." III Farnham, *Waters and Water Rights* § 878, at 2557 (1904).

■ "Whether waters are of a nature to be treated as 'surface waters' for the purposes of drainage must, in each case, be a question of fact to be determined from the evidence." *Thompson,* 39 S.D. at 488, 165 N.W. at 13. Based on these and other authorities, the trial court observed that it was "readily apparent" that the waters in the irrigation pond were not surface water. We fail to find such reasoning clearly erroneous. The water had lost the characteristics of surface water by being contained

and stored in the irrigation pond. The pond also collected water from two artesian wells. Further, there is evidence that effluent and feedlot runoff were allowed to drain into the pond.

 Even if the irrigation pond water might be shown to be surface water, the discharge and flow of this pond was not restricted to a natural watercourse. In order to invoke the protection of the "civil law rule," the waters must be drained into a watercourse or into any natural depression whereby the water will be carried into some natural watercourse. *Johnson.* "If the surface water in fact uniformly or habitually flows off over a given course, having reasonable limits as to width, the line of its flow is within the meaning of the law applicable to the discharge of surface water, a watercourse." *Johnson,* 71 S.D. at 161, 22 N.W.2d at 740. The property of plaintiffs was literally inundated by this water, covering up to 75 acres of Dean Nelson's land and completely flooding John Gross' pasture. Though there is a natural waterway by way of a creek on these lands, it cannot be said that the entire property constituted a natural drainage area. It was for this reason the trial court ruled defendants did not fall within the civil law rule.

 The trial court was not mistaken in determining that "[c]learly, the above-cited rule contemplates a discrete channel, course, or stream for drainage, not widespread flooding and inundation of a servient tenant's lands." Drainage allowed, in conjunction with the natural easement rights set forth in *Thompson,* is "conditioned only that such drainage be accomplished without unreasonable injury to [one's neighbor's] land." *Thompson,* 39 S.D. at 488, 165 N.W. at 13. Thus, there is a proviso to the civil law rule that the surface waters should not be collected or permitted to collect and then be cast upon the servient estate in unusual or unnatural quantities. *Id.*

A well-settled rule is that surface water cannot be gathered together and cast in a body on the property of the lower owner.... "Everybody has a right on his own land to do anything with regard to the diversion of water, or the storage of water, or with regard to the usage of water, in any way he chooses, provided that, when he ceases dealing with it on his own land,—when he has made such use of it as he is minded to make,—he is not to allow or cause that water to go upon his neighbor's land so as to affect that neighbor's land in some other way than the way in which it had been affected before."

III Farnham, *Waters and Water Rights* § 887, at 2578–79 (1904). Defendants had no right, in law, to accumulate this water and discharge it upon their neighbors, to the absolute detriment of their neighbors.

III.

### DID THE TRIAL COURT ERR IN FINDING EACH AND ALL OF DEFENDANTS JOINTLY AND SEVERALLY LIABLE FOR DAMAGE TO PLAINTIFFS' PROPERTY?

This is an instance where all defendants seem to factually have their hands in the pie, but when plans go awry, each defendant legally steps forward claiming "no involvement." Contentions, by each defendant, make it difficult to pinpoint exactly where liability should fall. Two main considerations governed the trial court's decision in finding all parties jointly and severally liable: 1) Everyone involved in the implementation of the dam breaching plan had a sufficient interest in the properties to halt the plan if it should prove unsafe or unworkable; and 2) all of the parties were present when the actual cutting of the dam occurred.

 Appellant James Sutton contends the trial court clearly erred in finding him personally liable. He insists the finding is not supported by the evidence. However, we determine the evidence preponderates in favor of the trial court's finding. In an action tried to the court without a jury, this Court will not disturb the findings unless the evidence clearly preponder-

ates against them. *Young v. Huffman,* 77 S.D. 254, 90 N.W.2d 401 (1958). There is testimony in the record substantiating, in entirety, all findings regarding Sutton's deep involvement in this matter.

Without question, the initial failure to maintain the feedlot facilities in general, and the irrigation pond in particular, rests with Missouri Slope. However, Sutton did lease the premises during the redemption period, conditioned upon his agreement to maintain the facilities. As lessee, he had a right to possession of the premises at the time the pond dam was breached. He did not check the artesian wells on regular occasions or take measures to regulate the water flows.

Sutton met with other former directors of Missouri Slope. With them, he devised the plan to breach the dam in order to comply with the EPA. With other former directors, Sutton contributed money toward implementation of the plan.

Based upon the above findings, the trial court further found:

> Therefore, James Sutton was not only dilatory in his maintenance of the feedlot premises and thereby contributed to the aggravation of the irrigation pond conditions, but he was also instrumental in devising the plan for breaching the dam, contributing moneys for its implementation, and was also present on the site of the dam on the date it was first breached, October 22, 1979.

Clearly, there was sufficient involvement to warrant a finding of liability against Sutton.

Connecticut Mutual also contends the trial court erred in finding it liable to plaintiffs for any damages resulting from the breach of the dam. As merely the holder of a Sheriff's Certificate, Connecticut Mutual claims it held absolutely no right or interest in the feedlot property during the redemption period, nor did it attempt to exercise such right. Though conceding it had the statutory right to prevent waste upon the property,[1] Connecticut Mutual claims error in the trial court's conclusion that liability may be premised on this right.[2] Finally, Connecticut Mutual insists that, although Connecticut Mutual's agent, Don Smith, took an active role in the implementation of the plans, at no time was Don Smith acting on its behalf.

The right to prevent waste upon the property might seem a tenuous base on which to rest liability. However, in light of the trial court's findings of fact, all supported by the evidence, the tenuousness diminishes. The court found Connecticut Mutual initially bound by the fact that its attorney was present at the foreclosure sale where John Gross was first informed of the plan to breach the dam. Also, during an injunction action prior to October 1979, counsel for Connecticut Mutual gave plaintiffs' counsel notice that the dam would be cut October 22, 1979.

The court found further suggestions that Connecticut Mutual had been far more involved with the properties at the time in question than merely holding the Sheriff's Certificate. These findings are supported in the record and, therefore, should be upheld.

Connecticut Mutual was fully cognizant of the Missouri Slope directors' plan and course of action followed for breaching the dam; though it held the sheriff's certificate and very likely the ultimate right to the feedlot premises, Connecticut Mutual acquiesed [sic] in the implementation of the plan. Moreover, the evidence leads to the inference that Connecticut Mutual encouraged and actively participated in the activities leading to the dam breaching. As descriptively stated by James Sutton, Connecticut was "ramrodding" the implementation of the plan after the EPA and Department indicated

---

1. *See* SDCL 21-52-2.

2. Conclusion of Law (5) reads:
 Connecticut Mutual had the statutory authority to preclude other persons and parties from participating in the dam cutting opera-

tion. SDCL 21-52-2 empowered Connecticut Mutual to prevent the commission of waste upon the feedlot premises by appropriate court proceedings. It did not do so.

their approval thereof, and Connecticut Mutual had been "riding herd" during the one year redemption period. . . .

A letter from Tom Adam (attorney for Connecticut Mutual) to plaintiffs' attorney specifically states that the plan "is something which Connecticut Mutual Life Insurance Company endorses so that the EPA permit with reference to the feedlot operation can be retained."

With regard to the involvement of Don Smith, the trial court found as follows:

Connecticut Mutual did present evidence seeking to establish the remoteness of its relationship to Don Smith; however, the evidence is also undisputed that Mr. Smith did monitor the feedlot premises for Connecticut Mutual, performed many sundry tasks on the premises (although claiming these were not performed for Connecticut Mutual), and did engage in verbal and/or written communications with Connecticut Mutual personnel both prior to and after the dam cutting. These communications concerned the progress of dam cutting, releasing the waters, condition of the dam and work performed on the premises.

Don Smith testified he was not paid by Connecticut Mutual for any work he did in connection with the dam incident. In fact, he stated that Connecticut Mutual specifically told him to do nothing on their behalf. He claims he was requested to oversee the project by Missouri Slope and that he did so gratuitously.

Smith also testified, however, that Connecticut Mutual monitored the entire operation and that he was in contact with them the entire period. Smith sent progress reports to both Connecticut Mutual and its attorney. On cross-examination, Smith admitted it was his job, apart from this plan, to oversee the interests of Connecticut Mutual and that at no time during this redemption period did he stop being Connecticut Mutual's correspondent.

■ Based upon the foregoing facts, the trial court specifically found that Don Smith was acting for and on behalf of Connecticut Mutual as its agent during all times material to the actions undertaken to cut the irrigation dam and restore the premises thereafter. If there is sufficient evidence in the record to support the trial court's decision, the reviewing court will not disturb the trial court's finding. *McLaughlin Elec. Supply v. American Empire Ins.*, 269 N.W.2d 766 (S.D.1978); *City of Rapid City v. Hoogterp*, 85 S.D. 176, 179 N.W.2d 15 (1970). The trial court did not clearly err. Its findings are fully supported in the record. Liability against all parties defendant was conceptually sound and properly entered.

## IV.

### DID THE TRIAL COURT ERR IN ITS AWARD OF DAMAGES?

■ Plaintiffs carried the burden of proof to establish damages by a preponderance of the evidence. By a preponderance of the evidence is meant the greater of weight of evidence. Defendants failed to rebut or refute plaintiffs' testimony relative to damages. Damage to plaintiffs' real property therefore stands totally uncontradicted in this record. Defendants apparently chose to put plaintiffs on their proof on damages without submitting any testimony whatsoever as a trial technique. Surely, this was their right but it was a monumental gamble, considering the highly damaging testimony of the plaintiffs, and particularly a high-risk defense knowing that the circuit judge had personally viewed the property and had become a paramount witness to the damage. We are not unmindful of the oft-quoted rule that the trier of fact judges the credibility of the witnesses. *Lukens v. Zavadil*, 281 N.W.2d 78 (S.D.1979); *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966); *Rowan v. Becker*, 73 S.D. 273, 41 N.W.2d 836 (1950). Here, in a case tried before the court, the circuit judge could observe the demeanor of the witnesses and ferret out the evidence which he believed was good or unworthy to his ultimate decision in awarding damages. Sitting as the trier of the fact, the circuit judge, likened unto a juror,

had the right to consider his ordinary experiences and observations in daily affairs of life. *Merrill v. Minneapolis & St. Louis Ry. Co.*, 27 S.D. 1, 129 N.W. 468 (1910). A circuit judge, likened unto a juror, may take into consideration "[m]atters of common knowledge and experience ... in arriving at [a judgment] and in drawing inferences and reaching conclusions from the evidence." 89 C.J.S. *Trial* § 463(b), at 99 (1955). This Court should not reverse or set aside these damages unless it appears the damages were not measured with reasonable certainty, based upon the evidence. "In ascertaining the amount of recovery, there must be a reasonable basis for measuring the loss; damages need only be measured with reasonable certainty." *Atyeo v. Paulsen*, 319 N.W.2d 164, 166 (S.D.1982), citing *Wang v. Bekken*, 310 N.W.2d 166 (S.D.1981), *Schmidt v. Forell*, 306 N.W.2d 876 (S.D.1981), *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114 (S.D. 1977), and *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977).

With the above legal observations and principles in mind, we reflect upon the evidence submitted on damages. Defendants, having not introduced damage evidence below, now criticize the award of damages by attacking the damage testimony of plaintiffs. Each brief of defendants stoutly advocates that the findings of fact on damages are clearly erroneous. We do not so find. Each brief of defendants also strongly asserts that there was a complete lack of evidence upon which damages could be determined with reasonable certainty. We do not so find. In essence, defendants flail the facts.

### Dean Nelson

Nelson was awarded $8,000 damages for temporary and permanent injury to his quarter-section of land. If there were no permanent injury to the land, as defendants contend, the award of $8,000 would be sustainable in temporary damages standing alone. Nelson's land was covered with brackish, foul, and contaminating debris, water and sedimentation. Out-of-pocket expense in landscaping costs amounted to $2,370. He lost his efforts of summer fallowing and was unable to use his property from October 1979 to May 1980. His uncontradicted testimony was to the effect that he was unable to use the land as winter pasture because of the icy conditions. He was unable to pasture 125 heifers which he had earlier purchased. In fact, he had to keep his cattle in all winter and feed them from his surplus feed supplies. His cattle would and could not walk on ice and the flooded portion, which was icy, isolated other pasture making it unavailable. Although he was not forced to purchase additional feed because of these conditions, he was forced to use feed which would have been available to him in the future. In other words, he was required to diminish feed supplies he otherwise would not have used. Feeding cattle hay, rather than have the cattle forage in the open, requires time, labor, and money. There can be no doubt that Nelson sustained serious weed problems from the feedlot waste and runoff which flooded his property. He testified that his entire farm had been diminished in value by $5 to $10 per acre or, alternatively, the quarter-section actually flooded had been diminished in value by $75 to $80 per acre. Based upon all of this testimony and a personal view of the property, the circuit judge entered a judgment for $8,000 for temporary and permanent injury to Nelson's quarter-section of land. Obviously, the court, which it had the right to do, rejected some of plaintiff Nelson's testimony and accepted other damage testimony. This Court is in no position to second-guess this award of damages for the trial court could well have determined that the noxious weed seeds implanted in the soil, arising from the flooding, was a nettlesome damage and permanent to such degree that it would require attention and toil in the future. This Court observes that there can be a permanent injury to land, which does not totally destroy its value, but diminishes its value. If the value of the real estate was totally permanently injured or destroyed, plaintiffs would recover its actual cash value as of the time of its

destruction. 22 Am.Jur.2d *Damages* § 134, at 194 (1965). This would be represented by the fair value of the property immediately before and immediately after the injury. 25 C.J.S. *Damages* § 84, at 920 (1966). Here, damages were awarded based upon diminution in value of the property as testified to by plaintiff. This was not a faulty measure of damage. SDCL 21-1-1 provides: "Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages. Detriment is a loss or harm suffered in person or property." SDCL 21-1-3 provides: "Damages must in all cases be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered." Nelson's award of damages is reasonable.

### The Grosses

The Grosses were awarded $16,000 damage for temporary and permanent injury to their two quarters of land. Further, they were awarded $25,000 damage for pollution and contamination of their domestic water well and permanent injury thereto. Again, the circuit judge personally viewed the premises and the well. As regards damages awarded to both Nelson and the Grosses, the trial court entered a conclusion of law that the breaching of the dam resulted in "unreasonable injury" to plaintiffs' lands and was the proximate cause of injury thereto. *LaFleur v. Kolda,* 22 N.W.2d 741. There is no doubt that flood water containing feedlot waste and effluent polluted two quarters of land owned by John and Ben Gross. The evidence clearly reflects that from the time of the inundation, said pollution existed upon the land until May 1980 in a frozen state. The trial court found that the Grosses encountered severe weed infestation on their land and had to fence off one area of pasture land because of a severe cocklebur infestation which developed after the flooding waters subsided. The general infesta-

tion, caused by this massive inundation of foul water and feedlot waste, required the Grosses to spray part of their land to control the weed growth, but they testified that this was of no avail. As indicated in the facts portion of this opinion, the Grosses complained that there were many vaccine bottles, old jugs, posts, manure, and other debris which remained on their lands after the flooding waters had dissipated. All of this constitutes damage to the Grosses' property and is attributable to a wrong done unto them. John and Ben Gross testified as to the diminishment in value of their land per acre; Ben Gross testifying that the two quarters had been diminished in value by $100 per acre; John Gross placed the diminishment at $80 to $100 per acre. Had the trial court accepted these figures in toto, the damage award would have reached a figure of $32,000 for the 320 acres. It is noted that the damage award to the Gross land was one-half of this amount. As to the proof of value, the rule is clear that "[t]he owner of property either real or personal is qualified to express his opinion of the value of the property by reason of his status as owner.... The weight to be accorded such testimony is for the [trier of fact]." *Hannahs v. Noah,* 83 S.D. 296, 301–02, 158 N.W.2d 678, 681 (1968); *Fredrick v. Dreyer,* 257 N.W.2d 835 (S.D.1977). Thus, the testimony of the Grosses as regards the value of their property was competent evidence. As in the Nelson case, the Grosses saw fit to prove up damage based upon diminution in value of the property. The Grosses did not maintain that there was a permanent injury to land which totally destroyed its value but asserted that there was permanent injury to land which caused a diminishment in its value. Essentially, all plaintiffs, by testifying to a diminishment in value of land, were testifying to the difference in the value of the property immediately before the flood and the value following its aftermath. Given these facts, we cannot fault such a proof on damages. It was a mode of proof which was not absolutely certain but reasonably certain and avoided a total

speculative base. It was competent evidence. "There is no one measure of damages so flexible it will fairly compensate for all injury to real property." *Ward v. LaCreek Elec. Ass'n*, 83 S.D. 584, 591, 163 N.W.2d 344, 348 (1968).

It might have been preferable to have had him state his opinion as to the value of the pasture land before the fire and its value afterward, instead of stating the difference between the value before and after [diminishment]; but his answer had the same effect. In substance, it amounted to the same thing, and a court should look to the substance.

*Houston & T.C.R. Co. v. Ellis*, 111 Tex. 15, 18, 224 S.W. 471, 471 (1920) (bracketed material supplied). We note the language in *Kressly v. Theberge*, 79 S.D. 386, 388–89, 112 N.W.2d 232, 233 (1961), quoting *Schankin v. Buskirk*, 354 Mich. 490, 497, 93 N.W.2d 293, 297 (1958):

"The law does not require impossibilities; and can not [sic], therefore, require a higher degree of certainty than the nature of the case admits. And we can see no good reason for requiring any higher degree of certainty in respect to the amount of damages, than in respect to any other branch of the cause. [The trier of fact is] allowed to act upon probable and inferential, as well as direct and positive proof. And when, from the nature of the case, the amount of the damages can not [sic] be estimated with certainty, or only a part of them can be estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit. This should, of course be done with such instructions and advice from the court as the circumstances of the case may require and as may tend to prevent the allowance of such as may be merely possible, or too remote or fanciful in their character to be safely considered as the result of the injury."

In *Kressly*, we reversed a $2,000 verdict for injury to land because there was no evidence of before and after damages or any independent value of the damage to trees and underbrush. Here, we have explicit damage testimony.

██ This Court has recognized the propriety of jury instructions measuring damages by the difference between the value of the property before and after the injury "in case of permanent injury to, or partial taking of, real property." *Ward v. LaCreek Elec. Ass'n*, 83 S.D. at 591, 163 N.W.2d at 348. An award of damages in *Ward* was reversed because there was damage to a house but there was no damage to the realty; thus, a diminution approach was held improper. In the event of a partial destruction of pasture or grassland, the Iowa Supreme Court has held the measure of damages to be the difference immediately before and immediately after. *Pascal v. Chicago, R.I. & P. Ry. Co.*, 160 Iowa 484, 141 N.W. 920 (1913). It would appear only just that where there is an injury to land and that injury encompasses detriment to crops in the future, the injured party is entitled to a further recovery other than the original injury (in this case, the flood). As an example, turf and roots could be injured by a fire or a flood for years to come.

██ Damage to real estate has been held to be permanent when it is "of such a character and existing under such circumstances that it will be presumed to continue indefinitely," *Worden v. Bielenberg*, 119 Minn. 330, 332, 138 N.W. 314, 315 (1912); when it is irremediable, *Douglas Aircraft Co. v. Kerns*, 164 F.2d 1007 (10th Cir.1947); when it "inconveniences the owner in its right and accustomed use, and requires time and expense to restore the land to its former condition," *Howell v. City of Dothan*, 234 Ala. 158, 163, 174 So. 624, 629 (1937); when it "will remain even though the cause has been abated," *Mikol v. Vlahopoulos*, 86 Ariz. 93, 94, 340 P.2d 1000, 1001 (1959); "without it being perpetual," *Lone Star Gas Co. v. Hutton*, 58 S.W.2d 19, 21 (Tex.Com.App.1933). Obviously, damages to realty are permanent where the act producing the injury to real estate reduces its productivity. Weeds destroy grass and curtail an animal husbandry and

farming operation. "The infestation of the property with noxious weeds would certainly, we think, materially injure the rights of the owner of the land." *Lytle v. Payette-Oregon Slope Irr. Dist.*, 175 Or. 276, 288, 152 P.2d 934, 939 (1944). When the usual consequence of the injury to the land is to cause it to be less productive, the "damages are usually measured by the diminution of the value of the land." *St. Louis Southwestern Ry. Co. of Texas v. Denton*, 288 S.W. 476, 477 (Tex.Civ.App.1926).

Apparently, defendants would argue that the weight of the testimony by the Grosses is so light or incredible that the award of $16,000 in temporary and permanent damage is reversible. We do not agree. Due to pollution and contamination of their domestic water well and permanent injury thereto, the Grosses were awarded $25,000. Certainly a well, which is contaminated to such extent that its water is unfit for human consumption, has sustained a permanent injury. Essentially, defendants attack the sufficiency of the evidence upon which to predicate an award of $25,000 for contamination of the well. They insist that the well damage is not supported by proper findings of fact and insist that the finding of fact thereon is clearly erroneous. In light of the principles reannounced in this decision, we cannot agree. It is fundamental to a conclusion on the well damage to recognize that all of the testimony of John and Ben Gross on their domestic well stands uncontradicted. Twenty years of well monitoring exhibited that the water level in the well was stable prior to the flooding. Testimony established the quality of the well was excellent. Their uncontradicted testimony establishes that the Gross family had used this particular well for consumptive purposes since homesteading this family unit early in the century; that this was the only well used for that period of time for consumptive purposes; that the water in the well turned brown, smelled bad, was putrid, and could not be consumed as drinking water. With the purchase of a water purifier to treat the well water, the water could be used in cooking. This is money damage. Destroying a rural family well is destroying the most vital support of family existence. Any ranch or farm, to be a living and working unit, must have a decent well. Ben Gross now purchases drinking water, according to his uncontradicted testimony, from a nearby town. Again, this is money damage and not just emotional damage suggested by the minority view. There is some testimony in the record that John Gross, occasionally, has partaken of purified water drawn from the polluted well. There was unrefuted testimony from John and Ben Gross that they were unable to dig another well due to the geology of the immediate area. John referred specifically to this as a "phenomena." These opinions were buttressed by history, for their father had tried to locate water for a well on several occasions during the 1920's, but was unsuccessful. Their testimony stands unrefuted that there was no other water to be located on this particular place for a family well. There is no dispute that the water in the well became unclear and bad smelling shortly after the flood upon the Gross land. For the defendants to argue that the well is unaffected or that the evidence is insufficient, is simply flailing facts which were tried below and personally observed by the circuit judge. Credibility of the witnesses and the weight to be accorded their testimony, as well as the weight of the evidence, is for the trial court. *Scott v. Wagner*, 274 N.W.2d 266 (S.D.1979). Furthermore, in a court trial, "[u]pon review, the evidence and inferences therefrom must be viewed in a light most favorable to uphold the verdict [judgment] and, if there is competent and substantial evidence to support the verdict [judgment], it must be upheld." *Dougherty v. Beckman*, 347 N.W.2d 587, 590 (S.D.1984) (bracketed material supplied). We decline to set aside the award of $25,000 damage for pollution and contamination of this domestic water well to a rural family on the state of this record. An application of SDCL 21–1–1 and SDCL 21–1–3 justifies a conclusion that the entire damage award to the Grosses was for a loss and harm suffered and which was reasonable.

Accordingly, we affirm the judgment of the trial court in its entirety.

FOSHEIM, C.J., and DUNN, Retired Justice, concur.

WOLLMAN and MORGAN, JJ., concur in part and dissent in part.

DUNN, Retired Justice, participating.

WUEST, Circuit Judge, acting as Supreme Court Justice, not participating.

WOLLMAN, Justice (concurring in part, dissenting in part).

I agree with the majority opinion that the trial court properly denied an injunction, that defendants had no legal right to discharge the accumulated water upon plaintiffs' land, and that each of the defendants was jointly and severally liable for damages. I also agree that the trial court's award for the damages resulting to the land from the flooding was not unreasonable. The award, although perhaps generous, finds support in plaintiffs' testimony regarding the infestation of perennial weeds resulting from the flooding, together with their testimony regarding the debris that was cast upon their lands and the fact that they were unable to use a portion of their lands from October of 1979 until the spring of 1980.

I am unable to agree, however, that the trial court's award of $25,000 for the damages to the Grosses' well finds support in the evidence.

As the majority opinion points out, "In determining the amount of recovery, there need only be 'a reasonable basis for measuring the loss' and it is only necessary that the damages 'can be measured with reasonable certainty.'" *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114, 118 (S.D. 1977) (citing *Kressly v. Theberge*, 79 S.D. 386, 112 N.W.2d 232 (1961).

When measured against this standard, I find the testimony regarding the damages to the Grosses' well to be insufficient to support the trial court's award. There is no question but that the well was damaged inasmuch as the ground waters which provide its source were apparently polluted by the floodwaters cast upon plaintiffs' land. The question remains regarding the extent and permanency of this damage.

The trial court stated in its memorandum decision (later incorporated into the findings of fact and conclusions of law) that

Ben Gross testified that he has refused to drink water from their well since the flooding and he has purchased or otherwise obtained water for consumption elsewhere since that time. John Gross corroborated his brother's testimony regarding the quality of the domestic well water following the flooding and further testified he has used the well water since then for culinary purposes after they installed a purifier to the well water system; still, he refuses to drink the well water.

Finding of Fact 35 states: "John and Ben Gross believe the flooding seriously damages the quality of their domestic well and refuse to drink water from the same since the flooding despite the installation of a purifier." Conclusion of Law 8 states in part that "[t]he Grosses shall further be awarded Twenty-five Thousand Dollars ($25,000.00) damage for pollution and contamination of their domestic water well and permanent injury thereto."

Although both Ben and John Gross testified that they now refuse to drink the water from the well, John Gross acknowledged that the water is drinkable once it has been run through the purifier that his son installed following the flooding. There is no competent evidence in the record regarding the permanency of the pollution. Also, aside from John Gross's testimony that his father was apparently unsuccessful in finding another location for a well in the 1920's, there is no competent evidence that this is the only well that could be successfully drilled on the Grosses' property. Now this may be a fact, but I would require that more positive evidence be submitted in the way of hydrologic surveys or testimony from well drillers having experience in the area.

No one disputes that the Grosses suffered damages to their well. No one disputes the critical importance of an adequate domestic well to the habitability of a farm and ranch home. Given the importance of an adequate supply of potable water, one can readily understand the an-

ger and concern that the Grosses have felt as a result of the polluting of their well. If emotion is an adequate substitute for evidence on the issue of damages, then beyond peradventure the trial court's award is supportable. If, however, we are to adhere to our long-standing requirement that there be some reasonable basis in the evidence for the amount of an award of damages, then I conclude that we must reverse this portion of the judgment and remand the case to the circuit court for a new trial on the issue of damages arising from the injury done to the well.

I am authorized to state that Justice MORGAN joins in this concurrence in part and dissent in part.