Nathan MASH, Plaintiff and Appellee,

v.

Dale CUTLER and Dan Cutler,
Defendants and Appellants.

Nos. 17604, 17609.

Supreme Court of South Dakota.

Argued March 16, 1992.
Decided June 24, 1992.

Kennith L. Gosch of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, for plaintiff and appellee.

Thomas M. Tobin of Tonner, Tobin & King, Aberdeen, for defendants and appellants.

WUEST, Justice.

Dale and Dan Cutler (Dale and Dan respectively) appeal from the trial court's judgment awarding Nathan Mash (Mash) $49,429.39 plus prejudgment interest and costs for breach of contract. Mash also appeals the trial court's award of damages. We affirm.

Dale and Dan are father and son who make their living in the cattle business. They occasionally purchase and raise cattle for others. Dale runs a feedlot. Dan runs a ranch for the pasturing of cattle. Mash is a successful businessman who, in the middle 1980's, became interested in raising cattle.

Mash entered into an oral agreement with the Cutlers whereby Dale would acquire cattle for Mash, feed them on Dale's feedlot and sell them for slaughter at the appropriate time. In the latter part of 1986, Dale purchased 197 head of cattle—151 heifers and 46 steers (Herd I). Mash wanted the cattle purchased below market price. In the spring of 1987, Mash told Dale he wanted to breed the heifers. Because some of the heifers were not suitable for breeding purposes (they had become too fat or had been given male hormone implants to increase weight gain), the Cutlers sold the unsuitable heifers and replaced them with their own purebred breeding stock. The parties disagree as to whether this was with or without Mash's knowledge or permission. The forty-six steers were sold, and the proceeds were delivered to Mash. The heifers were put out to pasture.

In October 1987, Dale purchased on behalf of Mash Herd II, which he represented to be 187 head of Simmental crossbred heifer calves suitable for breeding. Again, Mash instructed that the cattle be bought two to three cents below market price. By agreement, Herd II was to remain in Dale's feedlot from October 27, 1987 to April 30, 1988. Mash prepaid feeding costs for Herd

II in November 1987. Records show that Dan did not pay out for expenses the entire amount he billed Mash for Herd II. Dan testified numerous cattle came from his own herd, and thus, there really was no discrepancy. In addition, Mash claims Dale promised him the cattle would gain one and a half pounds per day with a "zero death loss." Dale denied any such guarantee.[1]

In 1988, Mash purchased his own ranch (the St. Charles) and requested the Cutlers to ship Herd II there. The cattle were shipped in three installments consisting of sixty-five, sixty-two and sixty. (*See* chart in footnote 6). The final shipment was two months late due to an unrelated disagreement between Mash and Dale over a finder's fee Dale felt Mash owed him for helping Mash locate the St. Charles Ranch. The ranch manager (Dean) inspected Herd II and felt only forty-eight of the 198 head were satisfactory as breeding cattle. The rest were sold for slaughter.

Based on his dissatisfaction with Herd II, Mash demanded that Herd I also be shipped to the St. Charles. Initially, the Cutlers refused because Dan felt he had the right to possession of Herd I until weaning time had arrived. Dean inspected Herd I and felt the cattle were not being properly cared for and noted they had no tattoos which would indicate they had been Bangs vaccinated to prevent the occurrence of brucellosis.[2] South Dakota law prohibits the resale of non-Bangs-vaccinated cattle as breeding stock through sale barns in South Dakota.

Mash initially filed a cause of action seeking immediate possession of Herd I. Thereafter, a stipulation was entered into between the Cutlers and Mash, whereby the Cutlers promised to deliver 151 head of bred cattle. The stipulation specified the type and age of the cattle, how many calves Mash was guaranteed and how the remaining calves were to be divided. This

1. The trial court concluded these were merely estimates and that uncontrolled variables of the cattle industry such as winters and drought significantly effect weight gain. 1988 was a drought year.

2. Brucellosis is a disease which causes cows to abort and may infect humans causing great weakness, night sweats, remittent fever and generalized aches and pains. It is commonly referred to in the cattle business as Bangs disease.

stipulation is discussed in greater detail in part II.E.

Shortly after the stipulation was entered into, the Cutlers informed Dean eighteen head of the Herd I cattle had died. Dean testified when Herd I arrived at the St. Charles, one cow had a broken leg, two died shortly after arrival, and one had a lump on her jaw. Over half were older than the ages specified in the stipulation. Only ten of the calves met the standards of the St. Charles Ranch for breeding stock. The rest of Herd I was sold for slaughter.

After the cattle were delivered, Mash sued the Cutlers for damages resulting from the Cutlers' handling of Herds I & II. The causes of action were for breach of contract, breach of fiduciary duty, conversion, and fraud. In addition, Mash sought punitive damages. The matter was tried to the court. The trial court awarded damages for breach of contract; found there was no fiduciary relationship between the Cutlers and Mash; found the Cutlers converted to their own use at least seven head of Mash's cattle; but found the Cutlers' actions did not constitute oppression, fraud or malice, and their actions were not done willfully or wantonly and therefore, declined to award Mash punitive damages.

Both parties appeal. The Cutlers raise the following issues:

1. Whether the trial court erred in awarding damages caused by the Cutlers' failure to have all cattle Bangs vaccinated.

2. Whether Mash properly mitigated his damages by selling non-Bangs-vaccinated cattle for slaughter in South Dakota rather than shipping them to another state.

3. Whether the trial court's finding as to damages pertaining to the 1989 calf crop, which was not realized because Cutlers shipped only 133 bred heifers rather than 151 as stipulated, was clearly erroneous.

4. Whether the trial court erred in interpreting the stipulation entered into between the parties (the stipulation essentially served as the written contract on the Herd I cattle).

Mash raises the following issues:

1. Whether the trial court erred in calculating the difference in value between the cattle in Herd I as delivered and what should have been delivered pursuant to the stipulation.

2. Whether the trial court erred in failing to award to Mash damages based upon expenses incurred in providing testing and veterinary services to the Herd I cattle after their delivery.

3. Whether the trial court erred in finding that only seven head of Herd I cattle were converted by the Cutlers.

4. Whether the trial court erred in refusing to award punitive damages based on the Cutlers' conversion of Mash's cattle.

5. Whether the trial court erred in failing to award damages for Mash's loss of the 1989 calf crop which was not realized because the cattle actually shipped were unsuitable for breeding purposes.

6. Whether the trial court erred in finding no fiduciary relationship existed between the Cutlers and Mash.

7. Whether the trial court's finding that there was no fraud was clearly erroneous.

## I. STANDARD OF REVIEW.

A trial court's findings of fact are presumed correct unless they are shown to be clearly erroneous. *Chamberlain Livestock Auction v. Penner*, 462 N.W.2d 479, 482 (S.D.1990); *Sperry Corp. v. Schaeffer*, 394 N.W.2d 727, 730 (S.D.1986) (citing SDCL 15–6–52(a)).

'This court may not substitute its judgment of factual questions for that of the trial court unless the findings of fact are clearly erroneous. *Northern Farm Supply, Inc. v. Sprecher*, 307 N.W.2d 870 (S.D.1981). In applying the "clearly erroneous" standard, we do not ask whether we would have made the same findings as did the trial court. Rather, the test is whether, after reviewing all the

evidence, we are left with a definite and firm conviction that a mistake has been made. *Temple v. Temple*, 365 N.W.2d 561 (S.D.1985); *Cunningham v. Yankton Clinic, P.A.*, 262 N.W.2d 508 (S.D. 1978); *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). The findings of fact made by the trial court are presumptively correct. The burden to show error is on the appellant. *Temple, supra; Hilde v. Flood*, 81 S.D. 25, 130 N.W.2d 100 (1964).'

*Penner*, 462 N.W.2d at 482 (*quoting Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 265 (S.D.1988)). Further, "[t]his court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence." *Cunningham*, 262 N.W.2d at 512 (citing *Potter v. Anderson*, 85 S.D. 142, 178 N.W.2d 743 (1970)). The credibility of witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we accord the trial court some deference based on its observations of the witnesses and the evidence. *Gross v. Gross*, 355 N.W.2d 4, 9 (S.D.1984) (citing *Nicolaus v. Deming*, 81 S.D. 626, 139 N.W.2d 875 (1966)). *Accord Fullerton Lumber Co. v. Reindl*, 331 N.W.2d 293, 296 (S.D.1983) (citing SDCL 15–6–52(a) (1984)); *Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455.

Furthermore, in a court trial, '[u]pon review, the evidence and inferences therefrom must be viewed in a light most favorable to uphold the verdict [judgment] and, if there is competent and substantial evidence to support the verdict [judgment], it must be upheld.'

*Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259, 273 (S.D.1985) (quoting *Dougherty v. Beckman*, 347 N.W.2d 587, 590 (S.D.1984). *Accord Opp v. Nieuwsma*, 458 N.W.2d 352, 358 (S.D.1990); *Farmers State Bank of Winner v. Westrum*, 341 N.W.2d 631, 634–35 (S.D.1983).

## II. NOTICE OF APPEAL ISSUES.

### A. *Contract Damages Generally.*

■ "In an action for breach of contract, the plaintiff is entitled to recover all his detriment proximately caused by the breach, not exceeding the amount he would have gained by full performance."[3] *Regan v. Moyle Petro. Co.*, 344 N.W.2d 695, 696 (S.D.1984); *Big Band, Inc. v. Williams*, 87 S.D. 24, 202 N.W.2d 121, 123 (1972). In other words, the ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed, *Macal v. Stinson*, 468 N.W.2d 34, 36 (Iowa 1991), or "to make the injured party whole," *Hulstein v. Meilman Food Industries, Inc.*, 293 N.W.2d 889, 891 (S.D. 1980). *See also Leingang v. City of Mandan Weed Bd.*, 468 N.W.2d 397 (N.D.1991). Damages not reasonably anticipated by the parties when they contracted are not recoverable. *Northern Farm Supply, Inc. v. Sprecher*, 307 N.W.2d 870, 873 (S.D.1981) (citing *Thermoid Rubber Co. v. Brictson*, 39 S.D. 114, 163 N.W. 567 (1917); SDCL 21–2–1); *Macal*, 468 N.W.2d at 36. Further, "damages which are uncertain, contingent or speculative cannot be recovered." *Sprecher*, 307 N.W.2d at 874 (citing *Kunkel v. United Security Ins. Co.*, 84 S.D. 116, 168 N.W.2d 723 (1969)). Finally, duplication of damages of the same nature and purpose is to be avoided. *K & E Land & Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 532 (S.D.1983); *Regan*, 344 N.W.2d at 697.

### B. *Diminution in Value of Herd I Caused by Failure to Bangs Vaccinate.*

■ The trial court, in its Memorandum Opinion, noted the Cutlers' failure to Bangs

---

**3.** SDCL 21–2–1 (1987) provides in pertinent part:

For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

SDCL 21–1–5 (1987) provides in pertinent part: Notwithstanding the provisions of these statutes, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides....

vaccinate thirty-nine of the Herd I cattle prohibited their resale through sale barns in South Dakota as breeding stock. *See* SDCL 40–7–20 (1991) (this statute was amended in 1990; the amendments reworded the statute but do not cause us to alter our analysis—it was amended again in 1992, subsequent to all events relevant to this appeal). Accordingly, it discounted the value of thirty-nine of the cattle.[4]

The Cutlers argue this was improper because they did not know at the time the agreement was originally entered into the cattle would be used for breeding purposes. They argue further that, by the time Cutlers decided to change to a calf operation, it was too late to Bangs vaccinate the remaining cattle. Finally, they did not know Mash would be reselling the cattle. Dale testified they sold the cattle from Herd I which were not eligible for breeding and substituted seventy cattle. He further testified the thirty-nine non-Bangs-vaccinated cattle were part of Mash's original herd.

■ The Cutlers' argument would be more persuasive except for the fact it was the Cutlers' breach of the stipulation which caused Mash to sell the unacceptable cattle. By stipulation dated August 31, 1988, the Cutlers agreed to deliver 151 head of bred cattle with 143 calves at side. Seventy-six of the cattle were to be three-year-old registered Simmental cattle. The registration papers for the same were to accompany the cattle. Seventy-five of the cattle were to be two-year-old crossbred cattle. Instead, sixty head were two years old, twelve head were three years old, twenty head were four years old, eight head were five years old, ten head were six years old, thirteen head were seven years old, six head were eight years old, three head were nine years old, and one cow was of an undetermined age. Over one-half of the cattle delivered did not conform to the stipulation. Further, it is standard procedure to Bangs vaccinate all cattle to maintain the option of selling them as breeders. In construing a contract where ambiguities exist, established trade customs and usages may ordinarily be considered. 17A Am.Jur.2d *Contracts* § 355 (1991). Finally, we note the Cutlers agreed to replace cattle not suitable for breeding purposes (some of the original Herd I cattle were implanted with male hormones). If the seventy cattle from Mash's original Herd I contained non-Bangs-vaccinated cattle, the Cutlers should have replaced them pursuant to their agreement. We uphold the trial court's award of damages based on the presence of non-Bangs-vaccinated cattle in Herd I.

### C. *Failure to Mitigate Damages.*

■ The thirty-nine non-Bangs-vaccinated cattle were ineligible for sale through South Dakota sale barns as breeding cattle. *See* SDCL 40–7–20. Mash's expert testified, as such, they were worth approximately $.50 per pound. The Cutlers argue Mash had a duty to truck these cattle to another state where Bangs vaccination was not required in order to mitigate his dam-

---

**4.** The trial court calculated damages based upon the difference in value of 151 cattle as called for in the stipulation less the value of the 133 cows delivered:

| | | |
|---|---|---|
| 76 registered Simmental × $800 | = | $ 60,800.00 |
| 75 cross bred × $750 | = | 56,250.00 |
| Value of cattle per Stipulation | | 117,050.00 |
| | | |
| 39 no [Bangs] tattoo (.50 lb. × 850 lb.) | = | 16,575.00 |
| 7 poor shape (.45 lb. × 850 lb.) | = | 2,677.50 |
| 2 died | | –0– |
| 84 balance × 750 lb. | | 63,000.00 |
| Value of cattle delivered | | 82,302.50 |
| Value of cattle per Stipulation | | 117,050.00 |
| Less value of cattle delivered | | 82,302.50 |
| Damages | | $34,747.50 |

ages, relying on *Gardner v. Welch*, 21 S.D. 151, 110 N.W. 110 (1906).

 "The burden of proving that damages would have been lessened by the exercise of reasonable diligence on the part of the claimant is on the party that caused the damages." *Renner Elevator Co. v. Schuer*, 267 N.W.2d 204, 207 (S.D.1978); *Kowing v. Williams*, 75 S.D. 454, 67 N.W.2d 780, 783 (S.D.1954) (matters in mitigation of damages constitutes an affirmative defense). Thus, it was the Cutlers' obligation to raise and prove this issue as a defense. Although the Cutlers did submit some testimony as to the costs of trucking cattle to Iowa and Minnesota, they failed to plead or raise this defense below and it is therefore waived. *Tri–State Refining v. Apaloosa Co.*, 452 N.W.2d 104, 111 (S.D. 1990); *Renner Elevator Co.*, 267 N.W.2d at 207. More importantly, the trial court made no finding of fact in regard to mitigation of damages, and the Cutlers neither submitted a proposed finding nor objected. *See* SDCL 15–6–52(a) (1984). If a party does not present proposed findings of fact, or by some other motion, objection, or exception indicate his disagreement with the trial court's findings, the sufficiency of the evidence to support the findings may not be questioned on appeal. *Jager v. Ramona Bd. of Educ.*, 444 N.W.2d 21, 26 (S.D. 1989); *Burke v. Lead–Deadwood School Dist. No. 40–1*, 347 N.W.2d 343, 344–45 (S.D.1984). *See also Sobolik v. Stone*, 420 N.W.2d 764, 767 (S.D.1988); *McCannon v. Lusk–Mitchell Newspapers*, 67 S.D. 291, 292 N.W. 82, 83 (1940). Indeed, the only objection to the trial court's findings submitted by the Cutlers was a blanket objection objecting to various findings and conclusions of the trial court. The objections were not set out with any particularity. We will not review a matter unless proper objection was made before the trial court. The trial court must be given an opportunity to correct its mistakes. *See Johnson v. John Deere Co.*, 306 N.W.2d 231, 239 (S.D. 1981). *Accord Till v. Bennett*, 281 N.W.2d 276, 278 (S.D.1979). We will not address issues raised for the first time on appeal.

*Penner*, 462 N.W.2d at 482; *Sobolik*, 420 N.W.2d at 767; *Mayrose v. Fendrich*, 347 N.W.2d 585 (S.D.1984).

## D. *Loss of 1989 Calf Crop from Herd I.*

 The Cutlers argue the trial court's finding as to damages caused by loss of the 1989 calf crop was clearly erroneous. The trial court found Mash lost seventeen calves from the 1989 calf crop as a result of the eighteen undelivered cows from Herd I. The stipulation required the Cutlers to deliver 151 head of bred heifers. They delivered 133. The Cutlers argue 60% of these calves would have belonged to them pursuant to the calf-share agreement and that the damages awarded should be reduced 60% (resulting in a credit of $4,845.00). Mash points out the calf-share agreement Cutlers refer to is for the *1988* calf crop, not the 1989 calf crop.

Mash alleged in his complaint the parties agreed to calf-share the 1988 calf crop from the 151 cattle in Herd I. The first 85% of the calves were to be divided 45% to Mash and 55% to the Cutlers. Any calves over 85% were to be divided 40% to Mash and 60% to the Cutlers. Further, the Cutlers guaranteed Mash fifty-two live heifer calves. This calf-share arrangement was incorporated by reference into the stipulation entered into between the parties. Indeed, the trial court did not award Mash any damages in regard to the 1988 calf crop because Mash received the minimum fifty-two heifer calves.

 The 1989 calf crop was not part of the agreement between Mash and the Cutlers. Nevertheless, the 1989 calf crop loss was a proximate result of the Cutlers' failure to deliver 151 bred heifers as agreed in the stipulation. *See* SDCL 21–2–1; *Regan*, 344 N.W.2d at 696. Loss of a calf crop is a reasonable measure of damages, *Hepper v. Triple U. Enterprises, Inc.*, 388 N.W.2d 525, 529–30 (S.D.1986), and we therefore conclude the trial court was not clearly erroneous in awarding Mash damages based on the *1989* calf crop loss caused by the Cutlers' breach.[5]

---

5. In their reply brief, the Cutlers change course abruptly. There, they argue Mash should not

E. *Trial Court's Calculation of Damages for Weight Gains on Herd II Not Realized.*

■ The trial court found the Cutlers agreed to "background" Herd II from October 27, 1987 to April 30, 1988 for a total feed price of $19,307.75. Mash prepaid the Cutlers. The bill for feed was based on Cutlers feeding the cattle for 186 days with one and one-half pounds of weight gain per day at a cost of $.25 per pound ($.375 per day). The trial court found the Cutlers did not guaranty weight gain of one and one-half pounds per day but that Mash was billed for feed based on purported weight gain on Herd II that was never realized. It' awarded Mash a $6,440.00 "refund."[6]

The Cutlers argue this award of damages is improper because the cattle were all kept by them until dates after April 30 (and presumably were fed during that time). Thus, they argue Mash should be charged for the extra feed required until the cattle were actually delivered to the St. Charles, or in the alternative, the weight gain which failed to accumulate should only be calculated to the date of April 30.

■ Ideally, the refund should be determined based on weight gain not realized as of April 30, since this is the date the parties agreed the backgrounding would end and any weight gain would have been achieved. The problem lies in the difficulty of proving what the cattle weighed on April 30, since they were not delivered until later times. It was through no fault of Mash that the cattle were delivered late. Where difficulty in ascertaining damages results from the actions of the party in breach, he cannot complain. *Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1202 (8th Cir.1982). *Accord Tri–State Refining*, 452 N.W.2d at 110.

■ Moreover, the Cutlers billed Mash for feed based on a weight gain of one and one-half pounds per day which was not realized. The Cutlers are asking for a credit based on extra feeding days even though weight gain was not realized on those days. Apparently, the feed bill was premised on the presumption that for every $.25 worth of feed fed to the cattle, they would gain one pound. Since the weight was not gained, Mash should not be required to pay for the feed.

F. *Trial Court's Interpretation of the Stipulation.*

■ The Cutlers next argue the trial court erred in interpreting the stipulation

"receive the maximum amount of income without any deductions for the costs involved in getting the calves to a selling position." The Cutlers misunderstand the nature of the damages awarded. The trial court did not award lost profits. It awarded only the replacement cost of the calves. The Cutlers also appear to argue Mash had a duty to cover, but the case cited, *Kanzmeier v. McCoppin*, 398 N.W.2d 826,

831 (Iowa 1987), merely states an aggrieved buyer *may choose* to cover by purchasing substitute goods. *Accord* SDCL 57A–2–712 (1988). Moreover, Cutlers' argument is flawed in that we are not dealing with a sales contract.

**6.** The trial court calculated the refund as follows:

| Date | No.– | Weight Billed For Feed | Less Shrink** | Actual Weight | Pounds Difference |
|------|------|------------------------|---------------|---------------|-------------------|
| 5–16–88 | 65 | 792 | 760 | 651 | 7,085 |
| 5–20–88 | 60 | 798 | 766 | 585 | 10,860 |
| 5–20–88 | 2* | 798 | | 850 | (104) |
| 6–30–88 | 60 | 859 | 825 | 693 | 7,920 |

Total Pounds 25,761

25,761 Pounds × .25 per pound = damages of $ 6,440

\* These are the only two cattle which gained weight in proportion to what Mash was charged for feed.

\*\* The trial court found cattle normally lose 4% of their weight during transport for which the Cutlers were not responsible.

entered into between Mash and the Cutlers. The stipulation was entered into shortly after Mash filed his original complaint. The stipulation provided in pertinent part as follows:

. . . .

2. On or before September 15, 1988, the defendants [Cutlers] shall in the presence of plaintiff [Mash] or his representatives, identify and deliver to plaintiff at defendant Dan Cutler's ranch plaintiff's 151 head of bred cattle with 143 calves at side. Defendant shall arrange with plaintiff's agent, John Dean, for a mutually satisfactory day for delivery of possession. *Deviation from above numbers shall be subject to paragraph # 6 TT.*

3. The 1988 calves shall be divided according to the division agreement as set forth in plaintiff's complaint.

4. Seventy-six (76) of the cows shall be three-year-old registered Simmental cattle and the registration papers for the same shall be signed and delivered to plaintiff by defendants on the same date possession of the cattle is given.

5. Seventy-five (75) of the cows shall be two-year-old cross-bred cattle.

6. The remaining issues in the lawsuit if not settled shall be presented to the court for determination. <u>Any discrepancy in number of animals to be delivered will be a remaining issue to be decided in later proceedings. TT.</u>

. . . .

(Underscored portion handwritten). The Cutlers argue the handwritten language means the actual number of animals to be delivered was to be decided in later proceedings. In other words, according to the Cutlers, the stipulation was not to bind Cutlers to a specific number of cattle to be delivered. They argue they are entitled to deduct a 3% death loss based on the previous oral agreement.

Addressing the merits of Cutlers' argument, SDCL 53-8-5 (1990) states:

The execution of a contract in writing, whether the law requires it to be written

or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

*See also McLaughlin Elec. Supply v. American Empire Ins.,* 269 N.W.2d 766, 769 (S.D.1978) (citing *Kindley v. Williams,* 76 S.D. 225, 76 N.W.2d 227, 57 A.L.R.2d 1070 (1956)); *Big Band, Inc.,* 87 S.D. 24, 202 N.W.2d at 122–23; SDCL 53-8-6 (1990). As such, the Cutlers cannot seek to introduce elements of the previous agreement between the parties which are inconsistent with the later memorialized agreement. *See generally* E. Farnsworth, *Contracts* § 7.3, at 454 (1982); 17A Am.Jur.2d *Contracts* § 399. Thus, their attempt to reintroduce the 3% death loss as contemplated in the original agreement is not persuasive. The stipulation made no mention of any permissible death loss. Since the stipulation provided for no death loss, Cutlers were bound to deliver 151 cattle as set out therein.

Moreover, the Cutlers' argument that the number of cattle to be delivered was to be decided later in court is meritless. The trial court determined the Cutlers were to deliver 151 head of cattle as stated in the stipulation. Therefore, the Cutlers were bound to deliver 151 head of cattle.

### III. NOTICE OF REVIEW ISSUES.

#### A. *Breach of Contract.*

1. Calculation of Damages as to Herd I.

Mash failed to cite authority to support his argument as to this issue, and it is deemed waived. SDCL 15–26A–60(6) (1984); *Waddell v. Dewey Cty. Bank,* 471 N.W.2d 591, 594 (S.D.1991); *Nielsen v. McCabe,* 442 N.W.2d 477, 480 (S.D.1989).

2. Trucking, Yardage, and Veterinarian Expenses on Herd I.

▮ After Herd I was delivered to the St. Charles, Mash had them trucked to the Aberdeen Livestock Sales Co. for testing and veterinary services. Dean testified the cattle were sent to Aberdeen to be "blood tested" and "mouthed" because of the cow with the broken leg, the presence of other

sick cows in the herd and because of the disparity in the ages of cattle represented as Herd I. *See* discussion in Part II.B. Because the stipulation was for the Cutlers to ship the cattle only to the St. Charles, the trial court disallowed these other costs as damages.

Mash argues these expenses were a direct consequence of the Cutlers' breach of the stipulation. *See* SDCL 21–2–1; *Nelson v. Kittelson*, 72 S.D. 15, 29 N.W.2d 77, 78 (1947); *Thermoid Rubber Co. v. Brictson Mfg. Co.*, 39 S.D. 114, 163 N.W. 567, 568 (1917) (measure of damages in breach of contract action includes damages such as might naturally arise from the breach and were reasonably within the contemplation of parties at the time of making the contract). Mash had the burden of proving damages below, *Gross*, 361 N.W.2d at 269, and has the burden of showing the trial court was clearly erroneous here, *Penner*, 462 N.W.2d at 482.

While Dean decided to ship the cattle to Aberdeen for testing, no evidence is pointed out to us which indicates these expenses were a natural or direct result of the breach. Mash simply failed to carry the burden of proving this element of damages.

3. Damages as to Herd II.

Again, no authority was cited to support this argument which is a violation of SDCL 15–26A–60(6). The issue is deemed waived. *Waddell*, 471 N.W.2d at 594; *Nielsen*, 442 N.W.2d at 480.

B. *Conversion.*

■ Herd I was short eighteen head when delivered. The trial court found seven head of Herd I cattle were converted by the Cutlers. It accepted Dan's testimony that eleven head had died. Mash argues the trial court should have found eighteen head were converted from Herd I because Dan's testimony was self-contradictory.

While it is true that "[o]ne who interferes or acts in a manner that is inconsistent with another's property rights may be liable for the fair and reasonable market value at the time of the conversion[,]" *Denke v. Mamola*, 437 N.W.2d 205, 207

(S.D.1989) (citing *Rensch v. Riddle's Diamonds*, 393 N.W.2d 269, 273 (S.D.1986); SDCL 21–3–3), determining the credibility of a witness is the trial court's function; we will not usurp it. *Gross*, 355 N.W.2d at 9; *Fullerton Lumber Co.*, 331 N.W.2d at 296; *Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455. The trial court believed Dan's testimony that eleven head of Herd I died. We cannot step into the fact finder's shoes and determine which witnesses are believable. True, Dan's testimony was contradictory, and he was obviously guilty of very poor bookkeeping. Nonetheless, if the cattle died, the most the Cutlers are guilty of is unintentional conversion. As such, they are liable only for the value of the cattle in their condition prior to any conversion. *Lowary v. Lowary*, 43 S.D. 87, 177 N.W. 1011 (1920). The Cutlers were already found to be liable for that amount based on their breach of the stipulation. The same holds true for the seven cattle unaccounted for. Mash was already awarded damages for these cattle based on breach of contract. Mash is not entitled to double recovery. *K & E Land and Cattle, Inc.*, 330 N.W.2d at 532; *Regan*, 344 N.W.2d at 697.

■ Mash also argues he is entitled to damages based on the Cutlers' alleged conversion of part of Herd II. Mash's theory is that the Cutlers never actually purchased the cattle as promised until Mash demanded their shipment to the St. Charles. Based upon its perception of the credibility of the witnesses, the trial court specifically found the 187 head of Herd II existed on or about the date advanced by the Cutlers. One-hundred-eighty-seven cattle were delivered to the St. Charles. The trier of facts judges the credibility of witnesses. *Gross*, 361 N.W.2d at 269; *Nicolaus*, 81 S.D. 626, 139 N.W.2d 875. "Here, in a case tried before the court, the circuit judge could observe the demeanor of the witnesses and ferret out the evidence which he believed was good or unworthy to his ultimate decision in awarding damages." *Gross*, 361 N.W.2d at 269. True, there was a conflict between Dan's testimony and an exhibit he produced as well as

testimony by Dr. Snyder, a veterinarian, who stated he vaccinated only 176 head of cattle for the Cutlers. However, on appeal, we are not at liberty to change findings where the trial court has resolved conflicts in the evidence. *Insurance Agents, Inc. v. Zimmerman*, 381 N.W.2d 218, 219 (S.D. 1986); *Gross*, 361 N.W.2d at 266 (citing *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971)).

## C. *Punitive Damages Based on Conversion.*

■ The trial court found the Cutlers converted "at least seven head of Mash's cattle." "The fact that [the Cutlers] committed a wrongful act in retaining the property does not in itself justify the imposition of exemplary damages. The question is whether the conversion was accompanied by a willful and wanton disregard of the rights of [Mash]." *Rapid Sewing Ctr., Inc. v. Sanders*, 79 S.D. 373, 112 N.W.2d 233, 238 (1961). The trial court found the Cutlers' actions did not constitute oppression, fraud or malice, and were not done intentionally, willfully or wantonly. Accordingly, the court denied Mash's claim for punitive damages. *See* SDCL 21–3–2 (1987); *Yankton Production Credit Assoc'n. v. Jensen*, 416 N.W.2d 860, 863 (S.D. 1987). We cannot say its finding was clearly erroneous.[7]

## D. *Breach of Fiduciary Obligation.*

■ Mash alleged the Cutlers acted in a fiduciary capacity in their relationship with him. The trial court concluded no fiduciary relationship existed. "The existence of a duty and the scope of that duty are questions of law for a court to decide." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 839 (S.D.1990) (citing *Lalley v. Safway Steel Scaffolds, Inc.*, 364 N.W.2d 139 (S.D. 1985)); *Erickson v. Lavielle*, 368 N.W.2d 624, 627 (S.D.1985)). Thus, we may review the trial court's conclusion de novo. *Sudr-*

*la v. Commercial Asphalt and Materials*, 465 N.W.2d 620, 622 (S.D.1991).

We recently discussed the nature of the fiduciary relationship.

'A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.'

*Garrett*, 459 N.W.2d at 837–38 (emphasis deleted) (*quoting Denison State Bank v. Madeira*, 230 Kan. 684, 230 Kan. 815, 640 P.2d 1235, 1241 (1982)).

'There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other.'

*Id.* at 838 (quoting *Yuster v. Keefe*, 46 Ind.App. 460, 466, 90 N.E. 920 (1910)). Finally, we held the relationship between a bank and its customer can become a fiduciary relationship if the borrower reposes a faith, confidence and trust in the bank which results in dominion, control or influence over the borrower's affairs, but a "borrower who reposes the confidence must be in a position of 'inequality, dependence, weakness or lack of knowledge.'" *Id.* (quoting *Union State Bank v. Woell*, 434 N.W.2d 712, 721 (N.D.1989)).

While the Cutlers certainly exercised day-to-day management of Mash's cattle

---

**7.** Mash relies on *Stugelmayer v. Ulmer*, 260 N.W.2d 236 (S.D.1977), in which we held where the trial court found a conversion had occurred, it was obligated to make a finding on the issue of whether the defendant was "guilty of oppres-sion, fraud, or malice, actual or presumed...." *Id.* at 240. Here, the trial court has made the requisite finding, although it was not the finding Mash wanted.

herds, they were not in a position to control Mash's operations. Indeed, it was Mash who independently decided to enter the cattle business, first to raise cattle for slaughter, then for breeding. Mash independently decided to transfer the cattle to his own ranch, and was in a position to force the Cutlers to comply. Furthermore, it was Mash who decided to buy a second herd. The Cutlers were in no position to influence any of these decisions. They could simply give Mash advice which Mash was free to reject. *See id.* at 839. Moreover, Mash was a highly successful businessman, although new to the cattle raising industry. Mash was not in a position of "inequality, dependence, [or] weakness," although he may have lacked specific knowledge of the cattle-raising business. *Id.* at 838. We therefore conclude the trial court was correct in its determination that no fiduciary relationship existed between Mash and the Cutlers.

### E. *Existence of Fraud.*

 The trial court concluded Mash did not sustain his burden of proving fraud. Mash asserts the court erred. He argues, although an intentional breach of contract does not give rise to tort liability, fraud and deceit in the inducement of the contract is tortious conduct.

SDCL 20–10–1 (1987) provides:

One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damages which he thereby suffers.

SDCL 20–10–2 (1987) provides:

A deceit within the meaning of § 20–10–1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

"[T]he foregoing statutes are declaratory of the common law and comprehend an intention to mislead." *Rist v. Karlen,* 90 S.D. 426, 241 N.W.2d 717, 719 (1976); *Waggoner v. Midwestern Develop., Inc.,* 83 S.D. 57, 154 N.W.2d 803, 807 (1967). Questions of fraud and deceit are generally questions of fact and as such are to be determined by the fact finder. *Rininger v. Bennett Cty. School Dist.,* 468 N.W.2d 423, 426 (S.D.1991); *Garrett,* 459 N.W.2d at 847; *Laber v. Koch,* 383 N.W.2d 490, 492 (S.D.1986); *Commercial Credit Equipment Corp. v. Johnson,* 87 S.D. 411, 416, 209 N.W.2d 548, 551 (1973).

In 1987, the Cutlers agreed to purchase on behalf of Mash 187 head of Simmental crossbred heifers suitable for breeding. As was the case for Herd I, Mash instructed them to buy the cattle at a price a few cents below market price. Dan testified numerous cattle in Herd II came from his own herd and were full-blooded Simmental. The Cutlers claimed Tom Phillips, Mash's previous ranch manager, approved a later substitution of crossbred cattle for the full bloods. Phillips denied he would have approved such a substitution without Mash's approval. In any event, Dan admitted buying cattle shortly before shipping Herd II to the St. Charles in order to replace the unacceptable full-blooded Simmentals which were included in Herd II.

Unlike the stipulation entered into regarding Herd I, the Herd II agreement was never reduced to writing. As such, the trial court's assessment of each witness' credibility was crucial. The trial court chose to believe the Cutlers. The trial court believed the Cutlers were guilty of poor record keeping, probably poor management and of breach of contract, but not of intentional misrepresentation. The same analysis applies to the substitution of cattle in Herd I. In fact, Mash's argument is weaker in regard to Herd I given the fact it was his decision to switch to a cow-calf operation which necessitated the substitution of cattle. Again, determining the credibility of the witnesses is the role of

the fact finder. Where the trial court has resolved conflicts in evidence, we cannot change its findings. *Gross*, 361 N.W.2d at 266. Mash simply failed to meet his burden of proving fraud and deceit. "It is thus unnecessary to take the next step and discuss whether this case [is a] proper one for the imposition of punitive damages...." *Rist*, 241 N.W.2d at 720. Mash's last argument does not merit discussion.

We affirm.

MILLER, C.J., and HENDERSON, SABERS and AMUNDSON, JJ., concur.