HIGH PLAINS GENETICS RESEARCH, INC., Plaintiff and Appellant,

v.

J K MILL–IRON RANCH, a Colorado Business, and John Stamison, Individually and as Proprietor or Owner d/b/a J K Mill–Iron Ranch, Defendants and Appellees.

No. 18687.

Supreme Court of South Dakota.

Argued Oct. 18, 1994.

Decided July 12, 1995.

Rehearing Denied August 17, 1995.

Franklin J. Wallahan, Ronald W. Banks, Benjamin J. Eicher of Wallahan, Banks & Eicher, Rapid City, for plaintiff and appellant.

Daniel Duffy of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendants and appellees.

KONENKAMP, Justice.

High Plains Genetics Research, Inc. brought suit against J K Mill–Iron Ranch and its owner, John Stamison, to collect unpaid billings for livestock embryo transfer services. Stamison counterclaimed. Following trial on December 15, 1993, the jury awarded High Plains $6,074.60 on its claim and returned a verdict for Stamison on his counterclaim: $47,000 for breach of contract and $103,000 for breach of fiduciary duty. The circuit court denied High Plains' motions for a new trial, judgment NOV, and remittitur. High Plains appeals raising five major assignments of error with numerous subassignments. Not all merit discussion. We review the following issues:

I.    Did Stamison produce sufficient evidence to justify submission of his case against High Plains for breach

of fiduciary duty and breach of contract?

II. Was the breach of contract verdict in error due to the admission of evidence which inflamed the sympathy, passion, and prejudice of the jury?

III. Did the trial court commit reversible error by failing to instruct the jury on affirmative defenses raised by High Plains?

IV. Did the trial court err in failing to grant a directed verdict for High Plains on its breach of contract complaint and in awarding certain costs to Stamison?

On High Plains' breach of contract claim, we affirm the damage award. On Stamison's counterclaim, we reverse the award for breach of fiduciary duty, affirm the finding of liability for breach of contract and remand for a new trial on damages only.

## FACTS

High Plains performs "fresh" and "frozen" embryo transfers. "Fresh" transfers entail retrieving, or "flushing," fertilized eggs one week into their embryonic stage from "donor" cows induced with hormones to "superovulate" to produce multiple pregnancies. These embryos are then inserted into "recipient" cows "cycled" to prepare them to accept implanted embryos. A "frozen" embryo permits deferring transfer to recipient cows. Freezing an embryo is a complex process in which it is first dehydrated, transferred into a straw, frozen through a special process, and stored. High Plains' services includes superovulation, cycling, freezing and transfer processes. The goal of either transfer process, of course, is to expand a cattle herd.

John Stamison specializes in raising registered Simmental cattle on his ranch in Barnesville, Colorado. After two other embryo transfer experts failed to obtain any pregnancies, Stamison contacted Dr. Merlin Gebauer of High Plains about using its facilities at Colorado State University to collect bulls and flush cows. Instead, Gebauer convinced Stamison that by using High Plains' services in Piedmont, South Dakota, he could achieve results superior to his past experience with the other service providers. From 1987 through 1991, Stamison made numerous trips to Piedmont, paying over $50,000 for fresh and frozen embryo transfer services. Only the frozen transfers were in issue in this case; Stamison was well satisfied with the fresh transfers. In 1990 High Plains assured Stamison that with frozen embryos it could achieve the industry standard of fifty percent pregnancies. Despite 126 frozen embryo transfers to recipient cows, only 16 pregnancies resulted.

When presented with his 1990 billings Stamison expressed dissatisfaction over what he thought were dismal results. Gebauer reduced the 1990 charges by $11,777.91; Stamison paid the bills, and continued to use High Plains' services until May 19, 1991. High Plains' success rate for Stamison failed to improve resulting in a decline in cattle sales. Stamison refused to pay for any 1991 services, frozen or otherwise, prompting this action.

## I. PROOF OF FIDUCIARY DUTY AND BREACH OF CONTRACT

The trial court allowed the jury to consider awarding separate damages on both theories in Stamison's counterclaim, which is permissible under some circumstances. See *Merrill Iron & Steel v. Minn–Dak Seeds, Ltd.,* 334 N.W.2d 652 (N.D.1983). But the court gave no direction on how the jury should differentiate between damages allowable under breach of contract and those permissible under breach of fiduciary duty so that a verdict would not yield double damages. See *Nelson v. WEB Water Dev. Ass'n,* 507 N.W.2d 691 (S.D.1993); *Greenwood Ranches, Inc. v. Skie Const. Co.,* 629 F.2d 518 (8th Cir.1980) (applying South Dakota law); SDCL 21–1–5. On the contrary, the court instructed the jury that it could award damages for loss of business reputation for "breach of contract or breach of fiduciary duty" which suggests that such loss could be different, and thus compensable, under each theory. For these and other reasons set forth below we are compelled to reverse and remand. High Plains contends that both theories were legally and factually inadequate to go to the jury. For the guidance of counsel and the court we will address the legal propriety of both theories and the trial court's rulings.

*Breach of Fiduciary Duty*

■ The existence of a fiduciary duty and the scope of that duty are questions of law for the court. *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 839 (S.D.1990). The trial court instructed the jury that "in South Dakota the relationship between a licensed embryo transplant facility such as High Plains Genetics and its customers is a fiduciary relationship." A fiduciary relationship is founded on a "peculiar confidence" and trust placed by one individual in the integrity and faithfulness of another. *Id.* at 837. When such relationship exists, the fiduciary has a "duty to act primarily for the benefit" of the other. *Id.* at 837. "Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." *Id.* at 837–38; *Nelson*, 507 N.W.2d at 698 (S.D.1993). South Dakota law reflects

> the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit. The law will imply such duties only where one party to a relationship is unable to fully protect its interests and the unprotected party has placed its trust and confidence in the other.

*Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 500 (S.D.1990) (citing SDCL 55–7–2(2)). We recognize no "invariable rule" for ascertaining a fiduciary relationship, "but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other." *Mash v. Cutler*, 488 N.W.2d 642, 652 (S.D.1992). We have held in bank cases, for example, that to establish a fiduciary relationship with a customer, that person must repose a faith, confidence and trust in the bank "which results in dominion, control or influence over the borrower's affairs." *Garrett*, 459 N.W.2d at 838. Also, the customer must be in a position of "inequality, dependence, weakness or lack of knowledge." *Id.*

Stamison argues that he placed his utmost confidence in High Plains entrusting it with his most valuable possessions: his donor cows and their financial potential. Evidence at trial established that one of High Plains' principals, Merlin Gebauer, holds a Ph.D. in reproductive physiology and that the company is certified by the American Embryo Transfer Association. Stamison, on the other hand, has a high school education. Thus by Stamison's reckoning, High Plains was in a position of superiority over him: the very nature of embryo transfer work, being highly specialized and requiring scientific expertise and training, placed Stamison in a position of dependence.

Nevertheless, characteristic features in a fiduciary relationship are absent in the Stamison–High Plains arrangement. Stamison never capitulated his will or his vigilance. Though Stamison entrusted valuable property to High Plains and placed confidence in its ability to perform highly technical tasks, High Plains never exerted dominance and influence over him. An experienced cattleman, Stamison performed some of the embryo transfer functions himself, including superovulating donor cows and cycling recipient cows. He also decided when to use his cattle or High Plains' cattle for the transfer process.

> One party cannot transform a business relationship into one which is fiduciary in nature merely by placing trust and confidence in the other party. There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection.

*Ainsworth v. First Bank of South Dakota*, 472 N.W.2d 786, 788 (S.D.1991). High Plains may have had superior knowledge and technical skills in embryology, but Stamison was not in a dependent position, lacking in mental acuity, business intelligence or knowledge of the basic principles involved.

Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other. Stamison's relationship with High Plains more closely possessed the earmarks of an arm's length business transaction. High Plains provided a specialized service and Stamison chose how and under what circumstances that service would be used. Stamison may have relied on High

Plains' expertise to accomplish his goals, but absent was the dominance-dependence imbalance found in fiduciary arrangements. Hence the trial court should have directed a verdict against Stamison on his claim for breach of fiduciary duty.

*Breach of Contract*

High Plains asserts that the trial court erred in allowing Stamison's breach of contract claim to go to the jury. We examine the specific assignments of error.

■■■ A. Breach of Good Faith and Fair Dealing. Count IV of Stamison's counterclaim alleges a cause of action for breach of good faith and fair dealing, separate from the breach of contract count. Settled law precludes such claims independent of contract. *Garrett,* 459 N.W.2d at 841–843; *Nelson,* 507 N.W.2d at 697. High Plains argues the trial court allowed this claim independent of contract, but High Plains' contentions are misplaced. From the outset, Stamison made it clear that his claim of breach on this matter was solely a part of the breach of contract claim. The instructions to the jury reflect the same, despite the fact the claim was disjoined in separate counts in the complaint. "Every contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Garrett,* 459 N.W.2d at 841 (citing Restatement (Second) of Contracts § 205 (1981)). Yet "good faith is not a limitless duty or obligation. The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.'" *Garrett,* 459 N.W.2d at 841 (citing *Sessions, Inc. v. Morton,* 491 F.2d 854, 857 (9th Cir. 1974)).

■ The jury had several relevant allegations to consider in determining if High Plains lacked good faith and fair dealing in the performance of its contract: substandard nutritional care, donor cows "running" with recipient cows, faulty work related to embryo transfers, and substandard results. A jury's primary function is to resolve conflicts in the evidence. *Mash,* 488 N.W.2d at 654. Efficient technique and precision were indispensable to successful embryo transfers. The evidence was sufficient for the jury to consid-

er breach of good faith and fair dealing in this contract action.

■ B. Good and workmanlike manner. Before the case was sent to the jury, Stamison withdrew all his negligence counterclaims. Jury Instruction 4 stated:

Defendants have the burden of proving . . .

(1) That Plaintiff breached its contract with the Defendant upon the terms and conditions agreed to by failing to provide frozen embryo transfer services *in a good and workmanlike manner* and by failing to produce pregnancies from the frozen embryo transfers consistent with the industry standard; [Emphasis added.]

High Plains believes the meaning of "good and workmanlike manner" was not defined for the jury, was beyond their understanding, and incorporated a negligence concept out of place in a contract action. We disagree. The term is often found in warranty actions, but it has wider application and its import is hardly abstruse. A task performed in a good and workmanlike manner, according to BLACK'S LAW DICTIONARY (5th ed. 1983 abridged), is performed "[i]n a manner generally considered skillful by those capable of judging such work in the community of performance." Even High Plains' witnesses expressed dissatisfaction with the company's results. Its "homemade" version of a fluid used in the frozen embryo transfer process on Stamison's cattle did not perform as well as commercially prepared versions. Expert testimony confirmed that High Plains' results were well below industry as well as High Plains' standards. The court's instructions enabled the jury to grasp that its purpose was to determine if High Plains' actions or inactions constituted breach of contract. The instructions were neither inadequate for this purpose nor prejudicial. *Frazier v. Norton,* 334 N.W.2d 865, 870 (S.D.1983); *Cody v. Edward D. Jones & Co.,* 502 N.W.2d 558, 563 (S.D.1993).

■ C. Loss of Business Reputation. The trial court instructed the jury that it may award damages on Stamison's claim for loss of business reputation. Relying on New York law, High Plains argues that such

claims are not supportable in a breach of contract case. *Dember Const. Corp. v. Staten Island Mall*, 56 A.D.2d 768, 392 N.Y.S.2d 299 (1977); *Amaducci v. Metropolitan Opera Ass'n*, 33 A.D.2d 542, 304 N.Y.S.2d 322 (1969). On the other hand, Stamison cites *Pemberton v. OvaTech*, 669 F.2d 533 (8th Cir.1982) (applying Wisconsin law), which addressed the issue of loss of reputation damages in a breach of contract case. There the wrong bull semen was used to inseminate a superovulated cow resulting in the transfer to recipient cows of seven embryos sired by the wrong bull; consequently, calf sale contracts specifying pedigree were cancelled, allegedly impairing the business reputation of the sellers. The Eighth Circuit ruled that to warrant such damages, "the evidence must demonstrate that the party seeking to recover has sustained some injury and must establish sufficient data from which the jury could estimate the amount." *Id.* at 541. Finding the proof too uncertain, the court declined to uphold the award.

"No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin." SDCL 21–2–1. Even if we were to follow the law set forth in *Pemberton,* to justify an instruction on loss of business reputation, Stamison had to produce specific data from which reasonable damages could be calculated. His evidence never went beyond generalities. Stamison's banker opined that in earlier years Stamison's reputation "in terms of the quality of cows that he produced" was "A-number-one," but at the time of trial it was "bottom line, not very good." People would still attend his auctions, but not as before. Stamison testified that because the frozen transfers failed to generate his own ranch's cattle for bull sales, he sold inferior bulls and thus "we have run all our customers off ... [the] cattle aren't held in high regard anymore as—you know, as a rule." At some point he explained that he was facing bankruptcy or liquidation. Yet High Plains, Stamison agreed, was not the whole problem, but part of the problem. Stamison's claim cannot rise above his own testimony. *Connelly v. Sherwood,* 268 N.W.2d 140, 141 (S.D.1978). Stamison's exhibits included auction sale records, but nothing pegged any alleged decline in sales specifically to High Plains. With this record the jury had no rational basis upon which to calculate damages and no instruction on loss of business reputation should have been given.

■ **D.** Failure to achieve "good results." High Plains equates its position with that of a physician charged with medical negligence and asserts that lack of "good results" cannot justify a breach of contract claim. High Plains, of course, was not in the business of performing the healing arts. Although High Plains made no specific promise to Stamison until 1990 when it then indicated that it could achieve the industry average (fifty percent success rate), it certainly asserted that it could outperform Stamison's earlier service providers. To suggest now that no success could be expected is untenable. High Plains provided a process designed to reduce the vagaries of natural reproduction in a cow herd and increase the pregnancy rate. In this industry apparently no provider guarantees a pregnancy for every transfer, but even High Plains' experts conceded at trial that its performance fell below acceptable standards.

## II. VERDICT AS PRODUCT OF PASSION OR PREJUDICE

■ In its brief, High Plains asserts many erroneous evidentiary rulings which cumulatively resulted in a verdict influenced by passion or prejudice. As we are remanding for a new trial on damages, we conclude only one issue merits consideration: Dr. Gebaur's alleged drinking. High Plains sought by motion in limine to prohibit any testimony that Gebauer smelled of alcohol or was intoxicated while on the job. When the motion was denied, High Plains received a standing objection on the topic. In hopes of reducing the impact, High Plains raised the issue before the jury first through its opening statement and through the testimony of several of its own witnesses. Stamison argues that by broaching the matter first, High Plains waived its objection. We disagree. The value in requesting protective orders and standing objections would be meaningless if a party who has made a proper record, but fails to convince the court to exclude evidence, waives the objection merely in attempting to

soften the prejudice by offering the evidence first. *Burnett v. Fowler*, 315 Ark. 646, 869 S.W.2d 694, 696 (1994); *State v. Hicks*, 133 Ariz. 64, 69, 649 P.2d 267, 272 (1982); *People v. Spates*, 77 Ill.2d 193, 32 Ill.Dec. 333, 336, 395 N.E.2d 563, 566 (1979).

Stamison testified that he had less confidence in Dr. Gebauer than one of his lab assistants, because "just once in a while [he] was a little bit less than par because from time to time he had been under the influence of alcohol." On cross-examination Stamison conceded, "You know, I don't think I have ever said that Merlin was intoxicated. I just said I had a problem with Merlin's drinking." Yet the record is devoid of any evidence that while Dr. Gebauer was working on Stamison's embryos or cattle he performed under the influence of alcohol. Stamison completely agreed with this and never asserted otherwise.

▆▆▆ Stamison's real concern, as he stated at trial, was Dr. Gebauer's shaking while working with the embryos under the microscope. Stamison associated this with the residual effects of alcohol abuse, but other than his naked opinion, there was no medical basis to assert a connection. The steadiness of Gebauer's hands in this technical matter was a legitimate concern relating to the quality of his work, but with Stamison's concession that he never saw Gebauer under the influence while working for him, a suggestion that alcohol was the cause for Gebauer's alleged shakiness would undoubtedly create prejudice. But even absent prejudice, the relevance is highly questionable. Also the trial court never balanced the probative value of this evidence with its prejudicial impact. SDCL 19–12–3 (Rule 403); *Shamburger v. Behrens*, 380 N.W.2d 659 (S.D.1986). We conclude, therefore, that High Plains' motion in limine should have been granted. Nonetheless, in view of the solid proof of substandard results, we do not believe this evidence was so prejudicial it impaired the jury's finding on liability, especially when even Dr. Gebauer agreed the results were unacceptable. *Estate of Billings v. Jehovah Witnesses*, 506 N.W.2d 138, 143 (S.D.1993); *Itzen v. Wilsey*, 440 N.W.2d 312, 314 (S.D. 1989).

## III. FAILURE TO INSTRUCT ON AFFIRMATIVE DEFENSES

*Unpled Affirmative Defenses Not Tried by Consent*

▆▆▆ High Plains contended at trial that because Stamison paid his bills for the years 1987 through 1990, inclusive, and accepted nearly a $12,000 discount on his 1990 bill, such constituted waiver, release, settlement, laches, estoppel, and accord and satisfaction. Except for settlement and accord and satisfaction, High Plains failed to plead these affirmative defenses. The trial court refused to instruct on any of these defenses whether pled or not. A party has "a duty to plead" affirmative defenses; failure to do so results in a bar to the defense. *Farmers Cooperative Elevator Co. of Revillo v. Johnson*, 90 S.D. 36, 237 N.W.2d 671 (1976). We recognize two exceptions to the rule that affirmative defenses not pled are waived: (1) An affirmative defense is not waived if the pleadings are properly amended to include the defense or (2) if the issue was tried by express or implied consent. *See* SDCL 15–6–15(a) and 15–6–15(b). High Plains contends that the unpled defenses were tried by consent. SDCL 15–6–15(b). In *American Property Services v. Barringer*, 256 N.W.2d 887, 891 (S.D.1977), this Court recognized the following test for allowing unpled affirmative defenses:

> The test for allowing an adjudication of an issue under FRCP 15(b) and SDCL 15–6–15(b) tried by implied consent is whether the opposing party will be prejudiced by the implied amendment, i.e., did he have a fair opportunity to litigate the issue, and could he have offered any additional evidence if the case had been tried on the different issue. (Citations omitted.) Where there has not been a fair opportunity for a party to be heard on the issue and/or additional evidence could have been offered, any implied amendment would be prejudicial and no trial by implied consent exists.

*See also Oesterling v. Oesterling*, 354 N.W.2d 735 (S.D.1984). High Plains never attempted to broach these issues until settlement of jury instructions, after both sides had rested. Its reply to Stamison's counterclaim was not

amended to include these affirmative defenses, nor was the issue tried by the parties' express consent. We discern nothing in the record forming an indicia that these issues were tried by implied consent. In High Plains' opening statement counsel referred to a compromise the parties reached in 1990, but that obviously refers to the affirmative defenses actually pled: accord and satisfaction and settlement. Applying the above test, we believe it would be prejudicial to Stamison to allow these affirmative defenses to be raised for the first time during settlement of instructions. Furthermore, in applying this test, the rule presupposes that the unpled affirmative defenses actually possess legal merit within the context of the case. Yet High Plains cites no authority for its argument that by paying its bills Stamison vitiated his breach of contract claim. The trial court did not err in failing to instruct on the affirmative defenses not pled.

*Accord and Satisfaction—Settlement*

Though High Plains pleaded accord and satisfaction and settlement, the trial court refused to instruct on them, ruling that they had inadequate evidentiary support. When Gebauer agreed to reduce Stamison's 1990 bill by almost $12,000, he believed that would end Stamison's complaints. He testified that High Plains would not have done so if the issues were to remain open. No evidence in the record, however, establishes that anyone from High Plains told that to Stamison. In accord and satisfaction, there must first exist an accord: "An accord is an agreement to accept, in extinction of an obligation, something different from that to which the person agreeing to accept is entitled." SDCL 20-7-1. Stamison testified that the reduced bill did not compensate him for the pregnancies lost. Likewise, the record fails to disclose that High Plains communicated to Stamison that the bill reduction was in full settlement of any claims. To be enforceable, an oral agreement must be clear and definite in its terms. When terms are vague, there is no contract. *Garrett*, 459 N.W.2d at 839. The trial court did not err by refusing instructions on settlement and accord and satisfaction.

## IV. REMAINING ISSUES

High Plains requested $6,874.60 in damages from Stamison; the jury awarded $6,074.60. High Plains argues that the $800 discrepancy was an improper deduction for charges related to frozen embryo transfer work and the trial court should have directed a verdict in High Plains' favor for the full amount of damages sought. We find no error; the jury's verdict was within a justifiable range allowed by the evidence. *Lytle v. Morgan*, 270 N.W.2d 359, 361 (1978); *Hermsen v. Tarrell*, 85 S.D. 541, 188 N.W.2d 837 (1971).

High Plains also asserts the trial court erred in awarding disbursements. We review disbursement awards under the abuse of discretion standard. *Nelson v. Nelson Cattle Co.*, 513 N.W.2d 900, 906 (S.D.1994). Stamison claimed and the court awarded a total of $2,350.04 in disbursements. Under "miscellaneous expense" Stamison claimed a total of $401, which included the purchase of a book and mileage for Stamison's attorney and his secretary to travel to and from trial, along with mileage and a motel bill incurred by Stamison's attorney when he went to Colorado to consult with his client. Although the trial court has discretion in determining what disbursements constitute "similar expenses and charges" under SDCL 15-17-37 or what disbursements are allowed pursuant to SDCL 15-17-44, we conclude that these expenses are clearly not allowed under either statute. *Nelson Cattle*, 513 N.W.2d at 906. For this reason the trial court's award of these disbursements is reversed.

The jury's finding of liability for breach of contract against High Plains is adequately supported in the record, therefore we remand the case for a new trial limited to the issue of contract damages.

Affirmed in part, reversed in part and remanded.

MILLER, C.J., AMUNDSON, J., and WUEST, Retired J., concur.

SABERS, J., concurs in part and dissents in part.

GILBERTSON, J., not having been a member of the Court at the time this case was considered, did not participate.

SABERS, Justice (concurring in part and dissenting in part).

I agree that as a matter of law, instructions on damages for breach of fiduciary duty should not have been submitted to the jury.

However, the damages for breach of contract and breach of fiduciary duty are so intertwined that the breach of contract claim should be resubmitted to the jury on both liability and damages, subject to the pled defenses of settlement and accord and satisfaction. "Where ... the damages awarded are inseparable, or closely connected with other issues, a partial reversal on the question of damages is not permissible." 5 C.J.S. *Appeal & Error* § 928 (1993). In my view, we should not affirm liability in a vacuum and exclude, by appellate fiat, evidence of settlement, accord and satisfaction, loss of business reputation, or claims of intoxication or shaking while conducting tests. Our remand for a new trial on breach of contract should include liability and damages and not unduly tie the hands of the trial court, the parties and their attorneys or the jury.