#24636, #24840-a-SLZ

**2009 SD 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

L. S.,                                                    Petitioner and Appellant,

    v.

C. T.,                                                   Respondent and Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

L. S.,                                                    Plaintiff and Appellant,

    v.

C. T.,                                                   Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE BRADLEY G. ZELL
Judge

\* \* \* \*

RICHARD A. JOHNSON
GREGORY T. BREWERS of
Strange, Farrell & Johnson, PC
Sioux Falls, South Dakota                  Attorneys for appellant.

MARY H. BURD of
Burd Law Office
Sioux Falls, South Dakota                  Attorneys for appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 3, 2008

OPINION FILED **01/14/09**

#24636, #24840

ZINTER, Justice

[¶1.]          Former wife commenced actions for a protection order and for modification of the visitation provisions of her divorce decree, alleging that her former husband was sexually abusing the parties' child during visitations. The circuit court found that former wife failed to prove her allegations and denied relief. Because the circuit court's findings of fact are not clearly erroneous, we affirm.

[¶2.]          L.S. (Mother) and C.T. (Father) were married on August 29, 1999. They had one child, daughter C.M., born June 8, 2002. The parties were living in Nebraska at that time but separated approximately three months after C.M.'s birth. After the separation, Mother and C.M. moved to Missouri. For the next fourteen months, Father travelled ten hours, round-trip, to visit C.M.

[¶3.]          The parties divorced on March 1, 2004. They were granted joint legal custody, with Mother having primary physical custody. In June or July of 2004, Mother relocated to Canton, South Dakota and registered the divorce decree as a foreign judgment. Shortly thereafter, according to Mother, C.M. began making allegations of sexual abuse by Father.

[¶4.]          As a result of the allegations, Father was investigated in August and September 2004, by Detective Phil Lang of the Lancaster County, Nebraska sheriff's department and by Nebraska child protection officials. Detective Lang interviewed Father, who denied the allegations. C.M. was referred to the Child's

Voice[1] in Sioux Falls for a physical examination. C.M.'s examination did not show signs of abuse. Lang ultimately closed his investigation, and Jennifer Clark, a child protection official for Nebraska Health and Human Services, determined that C.M.'s allegations were "unfounded."

[¶5.]     In November 2004, Mother moved to modify or vacate the visitation ordered in the divorce decree. By stipulation of the parties, Dr. Andre B. Clayborne performed an evaluation. Following Dr. Clayborne's testimony in a visitation trial held in November 2005, the parties reached an agreement. Under the agreement, Father had visitation on alternating weekends, one of which was in Lincoln, Nebraska (where Father resided), and the other in the Canton area. The parties also agreed on alternating holidays. Mother did not object to unsupervised visitation at that time.

[¶6.]     However, days after the parties reached their agreement, Father received a call from Nebraska law enforcement that there were new allegations of abuse. Father cooperated and was again interviewed.[2] Child's Voice examined C.M. on November 23, 2005. By this time, C.M. was almost three and one-half years old, and Colleen Brazil, a forensic interviewer at Child's Voice, interviewed C.M. for the first time. C.M. told Brazil that "her daddy pokes her in the bottom

---

1.    Child's Voice is a private, non-profit children's medical evaluation center that accepts referrals from child protection agencies, law enforcement, and physicians.

2.    Another detective conducted this investigation as Detective Lang was unavailable.

with a stick that looks like a finger." C.M. informed Brazil that Father gets "the stick from outside."

[¶7.] In late February of 2006, the South Dakota Department of Social Services, Child Protection Services (CPS) initiated an investigation, and Child's Voice examined C.M. for a third time. Brazil conducted a second interview of C.M. She again told Brazil that her daddy was poking her with a stick in her bottom and that Father would get the stick from outside. Based on the entire investigation, CPS sent Father a letter in March 2006, informing him that the allegations of abuse were "unsubstantiated."

[¶8.] On June 28, 2006, Mother moved to modify visitation for reasons other than the alleged abuse. On November 21, 2006, however, Mother realleged the abuse, moved to modify visitation again, and commenced a protection order action on behalf of C.M. The circuit court promptly entered an *ex parte* temporary protection order limiting Father's visitation to a family visitation center pending a trial on the allegations.

[¶9.] Because of the allegations of sexual abuse alleged in Mother's action for a protection order, Father was again investigated by Detective Lang and Nebraska officials in December 2006/January 2007. Lang interviewed C.M. and later testified that it was apparent during C.M.'s interview that C.M. was "basically saying to me things that she has most likely overheard someone else saying." Lang explained:

> [T]here was a – there has been notations and documentations that "the stick" itself has transgressed – or not transgressed – but progressed from something that father got from the yard to looking like a finger or to being his finger. The "white stuff"

that came out was at one time purple, and there's indications to me that through these investigations and through the contacts with this – with [C.M.], that there is a high probability that she has been led, either intentionally or unintentionally, into making some of the disclosures that she makes, in my opinion.

On January 16, 2007, Nebraska Health and Human Services determined that the allegations against Father were "unfounded."

[¶10.] Trial was held on both actions on January 17, 2007 and May 7-8, 2007. Sixteen witnesses testified. Mother testified that when C.M. was just over two years-old, during diaper changes, C.M. would reach to her vaginal area, pull her labia apart, and make statements such as, "Dada do this." Mother also testified that C.M. would poke at her vagina. According to Mother, C.M. would additionally take her doll, spread its legs apart, and poke her finger between the doll's legs, saying "dad do this to [C.M.], dad do this to me." Mother indicated that these incidents would typically occur and increase in frequency around the time Father exercised visitation. Mother testified that when C.M. came home from visits with Father, C.M. demonstrated how she tried to resist the abuse by holding her legs together. According to Mother, C.M. informed Mother that "Dada hold me down and pull my legs apart and he poked me in the bottom."

[¶11.] Mother's great aunt testified that on two separate occasions, while C.M. was having her diaper changed, C.M. fondled her genitilia and made the statement, "Dada does this." She further testified that C.M. turned her doll upside down, rubbed it between the legs, kissed it between the legs, and said, "Dada does this." According to L.S.'s great aunt, during the summer of 2005, C.M. returned from visits with Father spontaneously reporting that Father would put his finger in

her bottom and it would hurt. The most recent incident known was in the fall of 2006, when C.M. told her that Father "put his finger in my bottom and it hurts."

[¶12.] Mother's aunt reported the same type of statements. According to Mother's aunt, in 2004, C.M. poked her vagina in the bathtub and said, "Dada do. Dada do." In November 2006, C.M. allegedly stated, "Daddy puts his finger and stick in me." C.M. further indicated that she is always sore "down there." According to Mother's other witnesses, C.M. made similar comments to Mother's parents and friends of Mother's parents, including Joann Herrington. Herrington testified that C.M. told Herrington that she did not like to go to her dad's house because he hits her and pokes her.

[¶13.] Mother retained Dr. Joyanna Silberg as an expert. Dr. Silberg met with C.M. the day prior to trial. Following a forensic interview, Dr. Silberg concluded that C.M. had suffered sexual abuse by Father. Dr. Silberg's testing reflected standardized scores that she characterized as "literally off the charts" in comparison to other children who had been sexually abused and significantly traumatized. According to Dr. Silberg, C.M. was a "severely traumatized child with an inordinate number of symptoms of both trauma and sexual preoccupation[.]" Dr. Silberg opined, with the "highest level possible for confidence," that C.M. was "a sexually abused child with all the symptoms and associated behavioral patterns[.]" Dr. Silberg believed it would be "dangerous even for supervised reunification because the child presumes that [the abuse] must have been okay if nobody is saying anything to them about it." Dr. Silberg conceded, however, that children can be subject to suggestion. She gave the example of telling a child "when you were a

little baby, I brought you home – you know – some place that you didn't bring her home from, and if you say that enough times, the child will believe[.]"

[¶14.] Dr. Charles Haigh testified that in October 2006, he had examined C.M. for dysuria (painful urination)[3] and prescribed treatment for a urinary tract infection. After reading C.M.'s history, Dr. Haigh decided to call Mother and examine C.M. again. Dr. Haigh's re-examination was inconclusive regarding sexual abuse. He acknowledged that his diagnosis was consistent with urinary tract infections and that dysuria was rarely caused by abuse.

[¶15.] Mother relied heavily upon the testimony of Dr. Scott Benton. Dr. Benton conducted a forensic evaluation by reviewing C.M.'s records from Child's Voice, the Nebraska investigations, videos of interviews, affidavits filed in support of Mother's motion, C.M.'s medical records, and Dr. Silberg's report. Dr. Benton concluded that C.M.'s disclosures were "incredibly detailed and intimate." He also found "no evidence of coaching of C.M." He recommended that *if* the court found that C.M. was a victim of abuse, he would strongly urge a protection order. Regarding C.M.'s dysuria, Dr. Benton testified that dysuria would most likely be caused by a urinary tract infection. And, like Dr. Silberg, Dr. Benton agreed that when something is reinforced many times, children actually believe it is real.

[¶16.] C.M.'s child's play therapist, Tara Olson-Larson, recommended that the court limit any contact between Father and C.M. to the family visitation center.

---

3. It is undisputed that Father had contacted Mother on different occasions with concerns about C.M.'s painful urination. Mother suggested diaper rash ointment, which Father then applied.

Olson-Larson recounted the long series of disclosures by C.M. and noted that C.M.

specifically disclosed on February 8, 2006, that Father "pokes" her in the vaginal

area. On the February 2006 examination at Child's Voice, however, C.M. indicated

to Dr. Sieczkowski that no one touched or hurt her in her vaginal or buttocks areas.

C.M. also indicated that no one touched her in those areas with a stick.

[¶17.]	Other witnesses also cast doubt on the allegations. Detective Phil

Lang recounted his office's investigations. Lang testified that the allegations were

unsupported and that there was no probable cause to arrest Father. He opined that

C.M.'s disclosures of sexual abuse were "tainted." Additionally, three South Dakota

CPS's investigations and two Nebraska Health and Human Service's investigations

were all declared "unsubstantiated" or "unfounded."

[¶18.]	Colleen Brazil, the forensic interviewer for Child's Voice, also raised

some doubt. She testified that she first interviewed C.M. in November of 2005.

Although C.M. indicated that she was poked in her rectal area with "the stick,"

C.M. could not indicate on the anatomical drawing the location of "the stick." C.M.

further informed Brazil that what comes out of the stick was "purple."[4] The second

time Brazil interviewed C.M. in February 2006, C.M. again indicated that she was

poked in her rectal area with "the stick" but that nothing came out of the stick.

[¶19.]	Unlike Dr. Silberg, Brazil indicated that C.M. had related to

suggestibility. Brazil explained suggestibility as follows:

> [T]he danger of repeated interviews with little children can be . .
> . that when they don't know the answer to something and they
> guess, . . . that starts to become part of their history or part of

---

4.	Both Brazil and Dr. Silberg testified that C.M. was competent in her colors.

> what they're talking about and they don't have an
> understanding that this was something that may have been
> suggested to them by someone else.[5]

Brazil testified that preschool-age children are the most vulnerable to suggestibility. She indicated:

> The danger of suggestibility is that once a child that – whatever
> it is that has been suggested to that child, it starts to become
> truth to them. So we have seen children where we have strong
> concerns about suggestibility, and the children truly believe
> that whatever – I mean, they're not lying necessarily. They
> truly believe that whatever it is has happened. They often . . .
> have fear about things because they do believe it has happened.

When asked, "So you feel that it's a potential of suggestibility with regard to [C.M.]?" Brazil answered, "Yes."

[¶20.]  Vicky Thompson, a child protection worker for Nebraska Health and Human Services, conducted interviews of Mother, C.M.'s therapist (Olson-Larson), and Father. Thompson found the allegations of abuse were unsubstantiated. Thompson raised concerns that Mother had "gone from place to place to try – from the Lancaster County Sheriff's Department to get an investigation going, to South Dakota CPS, the Nebraska child protection officials, to a therapist, to the Child's Voice in South Dakota, to the Child's Advocacy Center in Lincoln, Nebraska, to the doctors . . . to have someone find something that says her child has been sexually

---

5.  Because of Brazil's concerns about suggestibility, Child's Voice did not interview C.M. in November of 2006.

abused." Thompson believed that Mother was attempting to sabotage Father's visitation and his relationship with C.M.[6]

[¶21.]     Following consideration of this conflicting evidence at trial, the circuit court denied the petition for a protection order, finding that Mother had not proven by a preponderance of the evidence that C.M. had been sexually abused by Father. The court found that "[b]ased on all of the testimony presented by various health care professionals, experts, investigators and counselors," the evidence regarding the alleged abuse was "equal to both sides." Regarding Mother's request for modification of visitation, the court stated that it would like more information before it determined whether visitation should remain supervised. It ordered Mother to undergo a psychological evaluation[7] and Father to undergo a psychosexual evaluation. Pending those evaluations, the court continued visitation

---

6.     The visitation center's records from Father's February 15, 2007 supervised visit reflect the following:

> [C.M.] asks dad to take my shoes off. Dad helps take them off. Dad makes . . stinky noises to her shoes off. [C.M.] puts her feet in his face. [C.M.] smacks dad. Dad asks her not to hit him. She says, "no Mommy said I could." He clarified, "Mommy said you could hit me[?]" She said, "yes." He said, "no you can not hit me." She then says, "I only listen to Mommy[,] not you. Mommy said to not listen to you."

The records of Father's supervised visit on October 10, 2007, reflect the following:

> [C.M.] said that Mom said if she keeps saying no that she is not going to Dad's house and will not see him again. Dad asked [C.M.] is that what Mom said to her. [C.M.] replied, "Yes, and she never lies."

7.     The circuit court observed that "Vicky Thompson, of the Nebraska child protection office, feels strongly that [Mother] is abusing [C.M.] and that she needs a psychological evaluation."

at the family visitation center and ordered C.M. to continue counseling with Olson-Larson.

[¶22.]    After both parties completed their evaluations, the court held a second trial, considered additional evidence, and again found that Mother failed to prove her allegations by preponderance of the evidence.  In the circuit court's additional underlying findings of fact, conclusions of law, and memorandum decision, the court found that C.M. "believes these allegations to be true, but also the [c]ourt finds that the child is exhibiting the phenomena of suggestion of the alleged sexual allegations."  The court ultimately ruled that Father could exercise visitation outside the visitation center on alternating weekends.  However, at Father's request, "based on the fear of continued litigation," visitation was to be supervised by Mother or her designee.

*Denial of the Protection Order*

[¶23.]    Under SDCL 25-10-5, a circuit court may grant a protection order if it finds by a preponderance of the evidence that abuse has occurred.  "Preponderance of the evidence" is defined as "the greater of weight of evidence."  Gross v. CT Mut. Life Ins. Co., 361 NW2d 259, 269 (SD 1985).  The court found that Mother did not prove by the greater weight of the evidence that abuse had occurred.  Mother disagrees, arguing that "the evidence strongly contradicted such a finding."  We review this argument regarding a dispute of fact under the clearly erroneous standard of review.  Schaefer *ex rel.* S.S. v. Liechti, 2006 SD 19, ¶8, 711 NW2d 257, 260.  In applying that standard,

> [O]ur function is not to decide factual issues de novo.  The
> question is not whether this court would have made the same

findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed. This court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence. Doubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's 'version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.'

Goeden v. Daum, 2003 SD 91, ¶5, 668 NW2d 108, 110 (citations omitted).

Ultimately, "'[w]hen there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Zarecky v. Thompson, 2001 SD 121, ¶11, 634 NW2d 311, 315 (quoting First Bank of Biwabik, MN v. Bank of Lemmon, 535 NW2d 866, 869 (SD 1995)).

[¶24.]     We first observe that the circuit court gave serious consideration to Mother's allegations and the evidence supporting those allegations. We also observe that the court made its factual determination after considering the testimony of sixteen live witnesses, including several experts, C.M.'s therapist, and the documented interaction between Father and C.M. at the family visitation center. Thereafter, the court carefully weighed all of the conflicting evidence in light of the allegations and stated:

> It appears to this [court] that these are serious . . . allegations, disclosures that have been made by this young lady, and the [c]ourt observed that first hand, against her father. However, the evidence as it exists today, based upon those allegations, when you compare it to the other evidence that there is in this case that has been presented, essentially leaves this matter as the facts are equal on both sides. That being the case, the . . . [c]ourt is denying th[e] petition on a finding that [Mother] has failed to meet the burden by a greater weight of convincing force that domestic abuse . . . has been met.

[¶25.]    Mother, however, argues that the circuit court's decision was only based on "scant findings" that lack the detail necessary to provide meaningful appellate review. Relying on *Goeden*, 2003 SD 91, 668 NW2d 108, Mother contends that the court entered no findings regarding C.M.'s pattern of disclosures, facts relating to reliability of the context of the disclosures, the credibility of the witnesses, or the physical evidence. Mother further contends that the court only summarized some of the evidence and did not reach factual conclusions based on evidence.

[¶26.]    Mother's reliance on *Goeden* is misplaced. In *Goeden,* the circuit court's "only [finding] was a general statement [that] stalking had occurred" under the statute. *Id.* ¶8, 668 NW2d at 111. In this case, the circuit court entered twenty-seven findings of fact and five conclusions of law containing the underlying findings for its decision. In those findings, the circuit court specifically acknowledged the testimony of Dr. Silberg and Dr. Benton. The court also acknowledged the conflicting testimony from Detective Lang and Colleen Brazil. And, as noted above, the court found that all of the experts agreed that children are subject to suggestibility. Thus, the circuit court's analysis here is markedly distinguishable from that in *Goeden.* Because the circuit court's findings of fact sufficiently inform this Court as to the basis of the circuit court's decision, we are able to conduct a meaningful appellate review.

[¶27.]    Under our standard of review, we cannot conclude on this highly contested record that the circuit court was clearly erroneous in its factual finding regarding Mother's proof of abuse. Considering the conflicting evidence and the

circuit court's superior position to weigh the testimony of the live witnesses, Mother has not established clear error. As previously noted, "[d]oubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's 'version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.'" *Id.* ¶5, 668 NW2d at 110 (citations omitted). Further, as we have noted in other cases, "[t]here was a sharp conflict in the evidence and it was for the [circuit] court to decide whom it could believe." *See* Johnson v. Mier, 76 SD 109, 112, 73 NW2d 342, 344 (1955). Finally, "[w]here there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous." *Zarecky*, 2001 SD 121, ¶11, 634 NW2d at 315. The denial of the protection order is affirmed.

### *Modification of Father's Visitation Rights*

[¶28.]        Mother argues that the circuit court abused its discretion in declining to restrict Father's visitation rights to the family visitation center. A circuit court's modification of visitation rights is reviewed under the abuse of discretion standard. Osgood v. Osgood, 2004 SD 22, ¶9, 676 NW2d 145, 148. "The term 'abuse of discretion' refers to 'a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" Hrachovec v. Kaarup, 516 NW2d 309, 311 (SD 1994) (quoting Herndon v. Herndon, 305 NW2d 917, 918 (SD 1981)).

[¶29.]        Before making its final decision on visitation, the circuit court considered additional evidence. Father submitted to the psychosexual evaluation and Mother to the psychological evaluation. Dr. James K. Cole, Ph.D., completed the psychosexual examination of Father. According to Dr. Cole's testimony and

report, Father represented a "low risk to engage in sexual offenses." Dr. Cole noted that the sole risk factor Father presented involved the allegations that he had sexually abused C.M. According to Dr. Cole, no other risk factor was present. Dr. Stephan Langenfeld, Ed.D., completed Mother's psychological evaluation. Dr. Langenfeld opined that Mother "may be somewhat rigid or overly controlled emotionally and . . . presents with obsessive-compulsive personality characteristics." Dr. Langenfeld found, however, that Mother "presents with no major psychological disorders."

[¶30.]	The court also received updated family visitation center records and Olson-Larson's updated testimony. The court found it remarkable that Olson-Larson indicated C.M. could never discuss a time that she liked her father.[8] Olson-Larson acknowledged that even abused children can have positive thoughts toward the abuser and that most of the children she has worked with could identify one or more positives about the abusing parent. Olson-Larson indicated that C.M.'s behavior was atypical of abused children, even those who have been severely abused. Olson-Larson disclosed that during one session, C.M. informed her that she would like to take a big truck and knock "that place [the visitation center] down," so she would not have to go there anymore. C.M. informed Olson-Larson that when she knocked the center down, Father would die. C.M. indicated she wanted her father dead so she no longer had to have visitation with him. According to Olson-

---

8.	Similarly, Detective Lang testified that during his interview with C.M., she could not indicate one good quality about her father.

Larson, she had never experienced this with other five-year-olds.[9] C.M.'s atypical behavior was a factor in the court's decision. The court noted:

> Typically, children who have been abused by their parent, whether it be sexually, physically, or otherwise, usually note and express some positive parts of that relationship, meaning that there may have been good times, although there were these horrific, bad times. But they found because of the nature of family, because of the nature of the relationship, because of the nature of being offspring, they could recognize some good things in their father or their mother. And, typically, those children who were abused still want to maintain a relationship with that parent, even though they may understand and know that it sometimes had to be modified or at a distance because of what took place. This isn't the case here, meaning that [C.M.] wishes at this point in her life, for whatever is so ingrained, whether it be by the actual events that took place in her mind that she believes is to be true; that this [c]ourt has not found that there is a preponderance of the evidence to establish, or by programming or power of suggestion that she believes it to be true.

[¶31.] Following consideration of this additional evidence together with updated family visitation center records, the court issued additional findings of fact and conclusions of law that incorporated a five-page memorandum opinion. In that decision, the court recognized that it had "a duty to protect the children, and its decision must necessarily be guided by the best interest of the children." *See* Johnson v. Johnson, 471 NW2d 156 (SD 1991). The court, however, also noted that "law enforcement, as well as child protection agencies of two states have found the

---

9. Olson-Larson testified that as a result of this unusual behavior, she asked Mother where C.M. could have learned such thoughts. Mother related it to a "book on tape" they had listened to involving a family, including an orphan girl that died during a war.

child's allegations to be unsubstantiated."[10] The court found that Mother failed to prove her case because the child was "exhibiting [the] phenomena of suggestion of the alleged sexual allegations." The court specifically relied on the child's therapist and forensic interviewer explaining:

> This [c]ourt finds that the testimony of by Tara Olson-Larson shows that [C.M.'s] expressed terminology is not age consistent with [C.M.'s] age. While Ms. Olson-Larson does not believe [C.M.] has been coached as what to say, Ms. Colleen Brazil, of Child's Voice who has conducted a forensic interview with [C.M.], however, expressed concern that [C.M.'s] belief system may have been subjected to the phenomena of "suggestion."

Based on those findings, the court ultimately modified Father's visitation rights to include one weekend per month in Nebraska and one weekend per month in South Dakota. And, at Father's request, the visitation was ordered with Mother (or a designee) present at all times.

[¶32.] Because the circuit court lifted the family visitation center restriction, Mother argues that the remaining restrictions did not go far enough. Mother contends that the circuit court ignored Olson-Larson's opinion recommending visitation at the family visitation center. Mother further contends that the court ignored Dr. Silberg's and Dr. Benton's opinions and did not consider the concerns raised by the child protection workers. We disagree.

[¶33.] As previously noted, the court specifically discussed Olson-Larson's testimony, noting behaviors of C.M. that were atypical of abused children. The

---

10. The court also stated that C.M.'s statements were "not credible especially in light of the absence of medical documentation or first party witness to corroborate the alleged abuse." Although we note that neither medical

(continued . . .)

court also relied on Colleen Brazil, who conducted the forensic interview with C.M., expressing concerns that C.M.'s beliefs may have been subjected to suggestion. The court further relied on the child's actual interaction with Father, which was inconsistent with the allegations of abuse. The court observed that the updated family visitation center records suggested that with some encouragement, C.M. played with Father without apprehension or fear. Additionally, the court considered Mother's psychological evaluation and Father's psychosexual evaluation. Finally, the court expressly considered Mother's experts and the child protection workers. The court noted:

> [Mother] filed for a protection order and amended her motion on visitation alleging sexual abuse of [C.M.] by Father. This [c]ourt took several days testimony on these issues of the protection order and [Mother's] motion to modify visitations. The [c]ourt found that based upon all the testimony presented by various health care professionals, experts, investigators and counselors, the [c]ourt denied the protection order finding [Mother] had not proven by a preponderance of the evidence that [C.M.] had been sexually abused by [Father.]

Ultimately, the court's memorandum decision explained that even after considering all of the evidence, "the child's state of mind can only be explained by the phenomena of suggestion." Under this record, we reject Mother's arguments that the court did not consider all evidence. We find no clear error in the court's findings of fact, and consequently, no abuse of discretion in its decision to not further restrict Father's visitation.

_____

(. . . continued)
    documentation nor first party witness corroboration is required to prove child abuse, those facts were not the focus of the circuit court's analysis.

-17-

*Attorney Fees*

[¶34.]     Father and Mother have moved for appellate attorney fees under SDCL 15-26A-87.3.  Considering the seriousness of the issues presented and the substantial conflicting evidence, we deny both parties' requests.

[¶35.]     GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.